Kathryn R. BUCKLEY, Appellant,

v.

EXODUS TRANSIT & STORAGE CORPORATION, Appellee.

Superior Court of Pennsylvania.

Argued March 10, 1999.

Filed Dec. 31, 1999.

**300**

Christopher J. Pippett, Wayne, for appellant.

Reid Howell, Philadelphia, for appellee.

Before KELLY, LALLY–GREEN and BROSKY, JJ.

KELLY, J.:

¶ 1 Appellant, Kathryn R. Buckley, asks us to determine whether she met her burden of proof at trial in an action against Appellee, Exodus Transit & Storage Corporation ("Exodus"), a subsequent bailee, for damage to her goods, upon a showing that her goods were originally delivered to Ryan & Christie, a prior bailee, in good condition and later returned by Exodus in damaged condition. Appellant also asks us to determine whether Exodus should be regarded as an absolute insurer of her goods and thereby responsible for all of the damage to her goods, whenever it occurred, because Exodus charged Appellant for insurance on the goods as part of its storage fee. We hold that, under the circumstances of this case, to recover from Exodus, the subsequent bailee, for damage to her goods, Appellant had to prove that the alleged damage occurred as a result of the negligence of Exodus and under Exodus' watch. We further hold that Exodus cannot be regarded as an absolute insurer against all of the damage to Appellant's goods, where Appellant failed to establish that Exodus was liable for damage that may have been sustained prior to the time Exodus stored her goods. Accordingly, we affirm the judgment entered in the Chester County Court of Common Pleas in favor of Exodus.

¶ 2 The relevant facts and procedural history of this case are as follows. In 1985, Appellant arranged for Ryan & Christie to store her household possessions. Pursuant to the arrangement, on May 29, 1985, Appellant transferred possession of certain household goods to Ryan & Christie, the original bailee, for packing and storage in its storage facility located in Bryn Mawr, Pennsylvania. Ryan & Christie wrapped and packed Appellant's goods and stored them in several wooden pallets, box-like containers roughly five feet by seven feet by eight feet in size.

¶ 3 In September 1987, Ryan & Christie suffered a major fire in an adjacent storage building at the same location. Shortly after the fire, Appellant inspected some of her goods and was reassured that the fire had not damaged her belongings. Midyear 1988, Ryan & Christie moved Appellant's goods to their new storage facility, located in King of Prussia, Pennsylvania.

¶ 4 In June 1990, Ryan & Christie changed ownership. By August 1990, it was apparent that the new owners were unable to pay their creditors and the business filed for protection under Chapter 11 of the Bankruptcy Code. Thereafter, the Chapter 11 proceeding was converted to a liquidation proceeding under Chapter 7 of the Code. The bankruptcy trustee proceeded to liquidate the estate.

¶ 5 Meanwhile, Appellant again inspected her things in October 1991, while they were still stored in Ryan & Christie's King of Prussia facility. According to Appellant, the pallets looked the same as they did when she had previously seen them in the Bryn Mawr facility, although she admitted that she did not open all of the boxes. Sometime after that inspection, Appellant's goods were moved under the auspices of the bankruptcy trustee to a facility owned by Tinicum Properties Associates Limited Partnership ("Tinicum"). This facility was located in the old Westinghouse plant near the Philadelphia International Airport, in lower Delaware County. It was not established at trial when Appellant's goods had been moved or how long the goods had remained at the Tinicum facility.

¶ 6 Exodus was formed to purchase selected assets of the bankrupt estate. The sale was finalized in September 1993. Among the limited assets that Exodus purchased were certain storage accounts including Appellant's storage account. As part of the bankruptcy transfer, Exodus was not permitted to inspect any goods unless the owner of the goods was present. Exodus was also given just ten days from the date of sale to remove all of the goods

related to its purchased accounts from the Tinicum facility. Exodus promptly moved the goods to a temporary facility in West Norriton, where they remained for several weeks. In October 1993, the goods were finally transferred to Exodus' climate-controlled, state-of-the-art permanent storage facility in King of Prussia. Appellant's goods remained at this facility until they were returned to her in November 1994. The evidence disclosed that Appellant's goods had been moved a total of six times, including their return to Appellant in 1994, and stored over the nine years in five different facilities. Exodus controlled two of the facilities and was responsible for three of the six moves.

¶ 7 At trial, Appellant testified that her belongings were in reasonably good condition when she put them in storage with Ryan & Christie in 1985. When she inspected them in 1987 and again in 1991, the goods appeared to be in the same condition. Appellant admitted that in 1987 she did not do a complete check, but looked instead only at what was visible. In 1991, Appellant stated that she had the opportunity to inspect all of her property, which looked fine to her at the time. During the bankruptcy proceedings, Appellant stated, she was notified that the court had sealed all of her belongings and she was not permitted to inspect her goods. Appellant agreed that before and during the bankruptcy proceedings, her goods were moved at least three times, but she did not know how or who moved them. She also admitted she did not know when the damage had occurred.

¶ 8 In support of her position on the total extent of the damage, Appellant produced pictures and a videotape of items representative of the damage. She also presented the testimony of her friend, Mr. Dixon, who had accompanied her to the Bryn Mawr storage facility in 1987 to inspect her goods. Mr. Dixon testified that

they looked at some of the larger pieces but did not inspect all of goods at that time. He also stated that he had smelled dampness in that facility. He also accompanied Appellant to the King of Prussia facility in 1991. Mr. Dixon testified that they inspected many of the goods but not all of the furniture. He could not recall whether labels had been stuck to the items at that time.

¶ 9 In support of her case, Appellant also presented the testimony of her qualified expert, Walter D. Bender, ISA. Mr. Bender testified that he had examined the goods in March 1998 and had found most of the furniture was riddled with mildew. The furniture items had lost any value they may have had as antiques. Any repairs that could be done might render the furniture usable but could not restore their possible value as antiques. The clothing and other fabric materials were moth-eaten, climate-stained and mildewed. He stated that Appellant's paper items, such as cards, stamps and other keepsakes had suffered damage as well. The clothing and paper items were beyond repair. Bender estimated that the damage occurred within three to five years of his March 1998 inspection, which included the time Appellant's goods were in Exodus' possession.[1] He estimated that Appellant's damages exceeded thirty thousand ($30,000.00) dollars.

¶ 10 At the close of Appellant's case, Exodus moved for a compulsory non-suit. Following oral argument on the motion, the trial court determined that Appellant had established a *prima facie* case to the extent she had presented evidence that her belongings were in good condition upon their original release to Ryan & Christie and that the goods were in damaged condition upon their return to her by Exodus. The trial court stated:

[T]here's sufficient evidence from which the jury could infer, **thus far**, that [the

---

1. The expert's time frame also included time when Appellant's goods were still in the possession of Ryan & Christie, at the Tinicum facility, and in Appellant's possession following their return to her.

goods] were damaged while in the possession of [Exodus].

So unless and until [Exodus] comes forward to give an account of the matter, [Exodus] will have been presumed to have assumed responsibility for the loss. And accordingly, the motion is denied.

(N.T., 4/22/98, at 53) (emphasis added).[2]

¶ 11 Exodus then proceeded with its defense. Joseph W. Gilbert, corporate representative for Exodus, testified on its behalf. He stated that he had been one of the creditors in the Ryan & Christie bankruptcy. He was primarily interested in acquiring selected assets from the trustee, such as the name, telephone number, some of the equipment and the right to make application to the Public Utility Commission for approval as a licensed mover. Nothing, either implied or stated, in the bankruptcy agreement of sale transferred any corporate liabilities as a result of the sale.

¶ 12 Mr. Gilbert described the Tinicum facility where Appellant's goods were located at the time of the bankruptcy liquidation. He stated that the Tinicum facility was not climate-controlled. The warehouse was dusty; it had holes in the roof and water not only on the floor but also in the storage pallets. He explained that he had been given a very limited amount of time, about thirty to forty-five minutes, to examine the equipment. He was not permitted to open the pallets. Exodus was given only two weeks to evacuate the facility. Mr. Gilbert described how the pallets were pulled and serialized to expedite that evacuation. The pallets were then moved to Exodus' facility in West Norriton, which Mr. Gilbert described as dry, climate-controlled and secured. The goods remained in West Norriton for several weeks until they could be moved to Exodus' new facility in King of Prussia. There, Appellant's pallets were stored in a climate-controlled, state of the art facility until the goods were returned to Appellant in the same pallets. Each time Exodus moved Appellant's goods, they were carefully strapped and tarped to prevent any damage in transit.

¶ 13 Mr. Gilbert stated that Exodus attempted to contact Appellant on several occasions to arrange an appointment to inventory[3] her goods, but to no avail. A personal inventory by Appellant was further complicated by the fact that Appellant's account was in arrears. As a result, Appellant's pallets were never inventoried until the account was satisfied and the goods were redelivered to Appellant. Mr. Gilbert testified that while Appellant's goods were in Exodus' possession, they were stored in a state of the art environment as previously described. Exodus provided insurance on Appellant's goods in the amount of twenty thousand ($20,000.00) dollars, but only from the date Exodus took possession of the goods until they were returned to Appellant. According to Mr. Gilbert, at no time were Appellant's goods exposed to inclement weather or other adverse conditions while they were moved or stored by Exodus.

¶ 14 In rebuttal, Appellant stated that she had tried on one occasion in February 1994 to inspect her goods but was unable to do so because the goods could not be readily located in the new Exodus facility at King of Prussia. Appellant also claimed she had been shown her goods, stored on a tractor-trailer in the parking lot of the facility. Appellant later testified that she saw her goods stored inside the facility on

---

2. Appellant had previously admitted during discovery that her goods had been insured while they were stored by Ryan & Christie. Counsel was permitted to ask Appellant, outside the presence of the jury, whether she had made a claim against that insurance. Appellant admitted that she had made no claim on that policy. (*Id.* at 64)

3. An inventory involved unpacking the pallets, unwrapping the goods, allowing an inspection and, if the customer wanted, the goods would be repadded, repacked, repalletized and restored. The inventory was arranged by appointment as an accommodation to the customer and was performed at Exodus' expense.

**304**

another date. Appellant admitted that she had been reluctant to settle her account with Exodus and did so only shortly before the goods were returned to her. She claimed that the first opportunity she had to inspect her things was when they were returned to her in November of 1994. Upon that inspection Appellant learned of the damage, to which she had already extensively testified.

¶ 15 The jury returned its verdict pursuant to special interrogatories. The jury found that Appellant's goods had been damaged partly while in the possession of the prior bailees (Ryan & Christie and the trustee) and partly while in the possession of Exodus. The jury further found that Exodus had been negligent but that Exodus' negligence was not a substantial factor in bringing about the damage to the goods. The jury determined that the amount of damage to the goods was thirty thousand ($30,000.00) dollars. However, the jury concluded that it was unable to determine how much of the damage occurred while the goods were in the possession of Exodus. Based on these findings, the trial court molded a verdict in favor of Exodus. The trial court denied Appellant's post-verdict motions. This timely appeal followed.

¶ 16 Appellant raises two issues for our review:

IN AN ACTION AGAINST A BAILEE FOR DAMAGE TO GOODS WHICH ARE THE SUBJECT OF A BAILMENT, WHERE BAILEE TOOK POSSESSION FROM A PRIOR BAILEE, AND THEN RETURNED THE GOODS TO [APPELLANT]/BAILOR IN A DAMAGED CONDITION, DOES THE BAILOR MEET [HER] BURDEN OF PROVING THE GOODS WERE DELIVERED IN GOOD CONDITION TO THE SECOND BAILEE UPON A SHOWING OF DELIVERY IN GOOD CONDITION TO THE FIRST BAILEE, THUS SHIFTING THE BURDEN TO THE SECOND

BAILEE TO ACCOUNT FOR THE DAMAGED GOODS?

WHERE A BAILEE, AS PART OF ITS FEES, CHARGES INSURANCE UPON THE GOODS WHICH ARE SUBJECT TO THE BAILMENT, WITH NO WRITTEN AGREEMENT REGARDING SUCH INSURANCE BETWEEN BAILOR AND BAILEE, IS THE [BAILEE] AN ABSOLUTE INSURER OF DAMAGE TO THE GOODS WHICH ARE THE SUBJECT OF THE BAILMENT?

(Appellant's Brief at 4).

¶ 17 Initially, we must determine the proper scope and standard of review applicable to this appeal. In so doing, we have carefully examined the record as a whole, with particular emphasis on Appellant's post-trial motions and brief on appeal. In each prayer for relief, Appellant has requested vacation of the trial court's entry of judgment in favor of Exodus and entry of judgment in favor of Appellant. Appellant seeks a judgment in her favor in the amount of thirty thousand ($30,000.00) dollars, or, in the alternative, a favorable judgment in the amount of twenty thousand ($20,000.00) dollars, which represents the amount of insurance on the goods. Therefore, we will review Appellant's claim as an assertion that the trial court erred in denying a motion for judgment notwithstanding the verdict ("JNOV").

¶ 18 A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. *Davis v. Berwind Corp.*, 547 Pa. 260, 690 A.2d 186 (1997) (citing *Moure v. Raeuchle*, 529 Pa. 394, 604 A.2d 1003 (1992)). When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. *Korn v. Epstein*, 727 A.2d 1130 (Pa.Super.1999), *appeal denied*, 743 A.2d 921 (Pa.1999). In

so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. *Id.* Concerning any questions of law, our scope of review is plenary. *Davis, supra; Boutte v. Seitchik,* 719 A.2d 319 (Pa.Super.1998). Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. *Sewak v. Lockhart,* 699 A.2d 755 (Pa.Super.1997). If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. *Id.* A JNOV should be entered only in a clear case. *Nogowski v. Alemo–Hammad,* 456 Pa.Super. 750, 691 A.2d 950 (1997) (*en banc*), *appeal denied,* 550 Pa. 684, 704 A.2d 638 (1997) (citing *Moure, supra*).

¶ 19 Our review of the trial court's denial of a new trial is limited to determining whether the trial court acted capriciously, abused its discretion, or committed an error of law that controlled the outcome of the case. *Brown v. Philadelphia College of Osteopathic Medicine,* 449 Pa.Super. 667, 674 A.2d 1130 (1996). In making this determination, we must consider whether, viewing the evidence in the light most favorable to the verdict winner, a new trial would produce a different verdict. *Robertson v. Atlantic Richfield Petroleum Products Co.,* 371 Pa.Super. 49, 537 A.2d 814 (1987), *appeal denied,* 520 Pa. 590, 551 A.2d 216 (1988). Consequently, if there is any support in the record for the trial court's decision to deny a new trial, that decision must be affirmed. *Johnson v. Hyundai Motor America,* 698 A.2d 631 (Pa.Super.1997), *appeal denied,* 551 Pa.

704, 712 A.2d 286 (1998). With these principles in mind, we now consider the propriety of the trial court's decision to deny Appellant the relief she requested.[4]

¶ 20 In her first issue on appeal, Appellant argues that the trial court improperly instructed the jury regarding the parties' respective burdens on the issues of when the damage to Appellant's goods occurred and the manner in which the damage occurred. Appellant contends, moreover, that the trial court erroneously applied the same incorrect legal standard in its decision to mold the jury's verdict in favor of Exodus. Appellant contends that once she had established that her goods were delivered to Ryan & Christie in reasonably good condition and were returned to her by Exodus in damaged condition, Exodus had the burden to produce evidence relating to the time and manner in which the damage occurred. Appellant complains that the trial court erred in refusing to give the jury her selected points for charge on these relative burdens. Appellant asserts that Exodus produced no evidence as to the time and manner in which the damage occurred. Thus, Appellant concludes that, as a matter of law, she was entitled to the entry of judgment in her favor. We disagree.

With respect to jury instructions, we note that the trial court is responsible for charging the jury on all relevant issues. When reviewing a challenge to a jury charge, we must examine the trial court's instruction in its entirety, against the background of all evidence presented, to determine whether error was committed. A jury charge is erroneous if the charge as a whole is inadequate, unclear, or has a tendency to mislead or confuse the jury rather than clarify a material issue. Therefore, a charge will

---

4. The record fails to disclose any request on Appellant's behalf for a new trial, as alternative relief. Nevertheless, because she has challenged the trial court's refusal to give the jury several of her proposed points for charge, we shall deem these objections as a request for a new trial as a new trial would be the appropriate relief. *See generally Summit Fasteners v. Harleysville Nat'l Bank & Trust Co., Inc.,* 410 Pa.Super. 56, 599 A.2d 203 (1991), *appeal denied,* 530 Pa. 633, 606 A.2d 902 (1992) (granting new trial for erroneous refusal to instruct jury).

be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said.

*Johnson, supra* at 636 (internal citations and quotation marks omitted). A trial court may refuse to give a requested point for charge when the substance of that request has already been given in another general or specific instruction. *Butler v. Kiwi, S.A.*, 412 Pa.Super. 591, 604 A.2d 270 (1992), *appeal denied*, 531 Pa. 650, 613 A.2d 556 (1992). Additionally, the trial court is not bound to use the exact language of a requested jury charge; it may choose another form of expression so long as it adequately and clearly covers the subject. *Brandimarti v. Caterpillar Tractor Co.*, 364 Pa.Super. 26, 527 A.2d 134 (1987), *appeal denied*, 517 Pa. 613, 539 A.2d 810 (1988). The court may refuse to submit for the jury's consideration a point for charge that is not strictly in accordance with the facts in evidence or the law in the case. *Schneider v. Lindenmuth–Cline Agency, Inc.*, 423 Pa.Super. 73, 620 A.2d 505 (1993). Likewise, the trial court may refuse points for charge that require qualification or modification, as the court is not responsible to mold or restate points that are not accurate as drawn. *Id.*

A bailment is a delivery of personalty for the accomplishment of some purpose upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, otherwise dealt with according to [her] directions or kept until [she] reclaims it. Therefore, a cause of action for breach of bailment agreement arises if the bailor can establish that personalty has been delivered to the bailee, a demand for return of the bailed goods has been made, and the bailee has failed to return the personalty.

*Price v. Brown*, 545 Pa. 216, 221, 680 A.2d 1149, 1151–52 (1996) (internal citations omitted). Where the allegations of a bailment indicate a bailment for mutual benefit, the bailee is required to exercise ordinary diligence and is responsible for ordinary negligence. *Id.* at 222 n. 2, 680 A.2d at 1152 n. 2.

One of the most important rights of the bailor is that, upon the termination of the bailment, [she] shall have returned to [her] the identical thing bailed. We are dealing with a situation where the rights of parties are fixed by contract, express or implied. ... As a result of that contract relation, when, in an action, a bailor shows the bailment, demand for the goods or termination of the contract and failure to deliver [the goods], [she] has made out a case which requires an answer from the bailee. The bailor says: Why do you not return the goods as you agreed to do? The bailee has not made a sufficient answer when he merely says that the goods were [lost, stolen, damaged]. Good faith requires that if the goods are not returned ... some account should be given of the time, place and manner of the occurrence of the injury so that the bailor may be enabled to test the accuracy of the bailee's report by suitable inquiries. The law of evidence as to *onus probandi* also becomes pertinent. When a bailee has exclusive possession of the goods, the acts attending loss or injury must be peculiarly within his own knowledge. Consequently, the bailee must excuse or justify the failure to deliver. This is an example of a presumption which arises as "a rule of proof production based upon the comparative availability of material evidence to the respective parties."

The amount of proof required of the bailee can only be stated in general terms and must vary with the circumstances. Ordinarily this is a matter resting in the sound and legal discretion of the trial judge.

*Schell v. Miller North Broad Storage Co.*, 142 Pa.Super. 293, 16 A.2d 680, 684 (1940) (internal citations omitted). The lynchpin of the presumption in favor of the bailor is exclusive possession by the bailee, for it is

this exclusive possession that puts the bailee in the superior position regarding the availability of material evidence. *Id.* By implication, without that exclusive possession, the bailee is not necessarily in any better position than the bailor to determine the time and manner of the loss. *See id.* In fact, while extensively reviewing other bailment cases, the *Schell* Court specifically reiterated that, to make out a *prima facie* case, it is incumbent upon the bailor to prove the bailment and that the goods were [lost, destroyed, damaged] while in the bailee's possession. *Id.* at 683 (emphasis added).

¶ 21 In the instant case, Appellant did not establish in her case in chief that only Exodus had sole possession of her goods to the exclusion of other bailees over whom Exodus had no control. Appellant was only able to establish that during the nine-year bailment, Exodus had possession of her goods for the last thirteen months of the bailment. The time frame for the occurrence of the damage provided by Appellant's expert included considerable time when Appellant's goods were either still in the possession of Ryan & Christie, at the Tinicum facility, or in Appellant's possession following their return to her, in addition to the thirteen months the goods were under Exodus' watch. To recover exclusively from Exodus, however, it was incumbent upon Appellant to prove that the damage to her goods occurred while in the possession of Exodus.[5] It is not clear on this record that Appellant even met her initial burden. *See Schell, supra.*

¶ 22 Nevertheless, and contrary to Appellant's contention, Exodus answered Appellant and provided an explanation as to when and where the damage occurred. Mr. Gilbert's testimony included a description of how the goods had been left in the Tinicum facility, which had holes in the roof and water on the floor. According to his testimony, the goods were exposed to moisture, humidity, water, and changes in ambient temperature without sufficient protection while in that facility.[6] This was precisely the kind of exposure Appellant's expert opined initiated the most serious and irreversible damage. The defense or answer to Appellant's charge did not disclose any negligence on the part of Exodus.

¶ 23 Likewise, nothing in the record necessarily put Exodus in a better position than Appellant to discover the insidious damage where Exodus was not permitted to inspect the goods before moving them.[7] *See Schell, supra.* Thus, the stated purpose of the *onus probandi* in typical bailment situations is not served under the facts of this case as the acts attending loss or injury to Appellant's goods were not peculiarly and exclusively within Exodus' knowledge. *See id.* The sufficiency of Exodus' explanation was within the trial court's discretion. *See id.* Accordingly, we will not second-guess the court's determination that the explanation provided by Exodus was enough to sustain its burden. *See id.*

¶ 24 Further, Appellant proceeded to testify in rebuttal. In the rebuttal testimony, Appellant attempted to establish that the goods were also exposed to cold,

---

5. The trial court denied Exodus' motion for compulsory non-suit. Because Exodus proceeded with its defense, the propriety of that decision is no longer reviewable. *See Shannon v. McNulty,* 718 A.2d 828 (Pa.Super.1998) (reiterating general principle that compulsory non-suit cannot be entered except in cases where it is clear that cause of action has not been established and plaintiff must be given benefit of all reasonable inferences arising from evidence, resolving any conflict in favor of plaintiff).

6. Additionally, Appellant's expert claimed that once the damaging exposure occurred, it would be fairly difficult to reverse the damage unless it had been promptly discovered and arrested.

7. Appellant claims that Exodus voluntarily assumed the risk that the goods were damaged when it purchased the Ryan & Christie assets. There is nothing in the record to support this contention.

moisture and dampness while in the possession of Exodus. Thus, the jury was essentially presented with factual discrepancies and credibility determinations, the resolution of which is not for us to disturb on appeal. *See Sewak, supra.* Considering all of the evidence admitted in this case, we hold that there was sufficient competent evidence to sustain the jury's verdict. Accordingly, Appellant's prayer for judgment in her favor as a matter of law was properly denied. *See Davis, supra; Moure, supra; Korn, supra.*

¶ 25 With respect to the jury instructions refused by the trial court, we see no merit to Appellant claims of error. Appellant objected to the denial of the following jury instructions:

No.6) When a bailor produces evidence that personalty has been delivered to the bailee, demand for return of the bailed goods has been made, and that the bailee has failed to return personalty, the bailee has the duty of going forward with evidence accounting for the loss, as it is assumed that under those circumstances that the bailee has failed to exercise duty of care required by agreement.

No.7) Should bailee go forward with evidence showing that personalty was lost and manner in which it was lost, and evidence does not disclose lack of due care, burden shifts to bailor to prove negligence on part of bailee.

No.8) In order for the duty to shift back to the bailor to prove the bailee's negligence, the bailee must show by clear and satisfactory proof that not only were the goods damaged but the manner in which they were damaged, and such proof must not disclose bailee's lack of due care.

No.10) [Exodus] failed in its burden of going forward with evidence accounting for the manner in which [Appellant's] property was damaged.

No.15) Judgment should be entered in favor of [Appellant] and against [Exodus] in the minimum amount of $20,-000.00 representing the insurance coverage for which [Exodus] charged [Appellant].

(*See* Appellant's Proposed Points for Charge; R.R. at 75a–78a.) As to jury instructions Nos. 6–8, the trial court determined whether the burdens set forth therein had been met prior to sending the case to the jury because under bailment law, these issues are questions of law. Thus, upon its denial of Exodus' motion for non-suit, the trial court determined as a matter of law that Appellant had presented enough evidence so far to defeat the non-suit. Therefore, proposed Instruction No.6 was not appropriate for the jury. Whether Exodus had satisfactorily accounted for the loss was an issue to be decided by the court as well. *See Schell, supra.* Therefore, proposed instructions Nos. 7 and 8 were also inappropriate for the jury. As to proposed instructions Nos. 10 and 15, these were tantamount to directing a verdict in favor of Appellant, which the trial court correctly refused to do in view of the facts and evidence presented in the case. *See Schneider, supra.* After the verdict was read, the court addressed counsel and said:

As near as I can tell in the cases, if there were a burden shifting at all it would only have been to raise a presumption of negligence. Inasmuch as the jury found that [Exodus] was negligent, whether there was a presumption or not, is of no consequence. Nothing in the cases indicates that the presumption goes beyond shifting the burden or creating a presumption of negligence. Nothing in any case that I have been able to find indicates that there's any presumption created with respect to when the damages occurred. Frankly, I haven't found any dual bailment cases.

(N.T., 4/23/98, at 72) (emphasis added). Following our review of the record, the applicable law and the trial court's jury instructions as a whole, we agree that Appellant retained the burden to prove Exo-

dus' negligence. The court instructed the jury, *inter alia*, that Appellant had to prove that Exodus was negligent while the goods were in its possession and that its negligence was a substantial factor in causing the damage to Appellant's goods. The record supports this instruction. *See Johnson, supra; Schneider, supra.* Accordingly, we hold that Appellant is not entitled to a new trial on the basis of allegedly flawed or inadequate jury instructions.

¶ 26 Appellant next complains that she should not have had to prove the amount of damage that occurred when her goods were in Exodus' possession. Appellant argues that Exodus charged her for insurance in the amount of twenty thousand ($20,000.00) dollars, without limitation, as part of its storage fee. As a result, Appellant claims, Exodus rendered itself an absolute insurer of her goods, regardless of how or when the damage occurred. Appellant contends that Exodus "chose not to inspect the goods prior to taking possession and had no idea when or where such damage may have occurred." (*See* Appellant's Brief at 16–17.) Appellant's argument suggests that Exodus assumed the risk that her goods were already damaged and should bear the liability at least to the limits of the insurance it provided. Appellant concludes, therefore, that the trial court erred in molding the verdict in favor of Exodus instead of molding it in her favor in the insurance amount of twenty thousand ($20,000.00) dollars. We disagree.

¶ 27 A bailee may by special contract assume the extraordinary liability of an insurer of the bailed property. *Loeb v. Ferber*, 346 Pa. 348, 30 A.2d 126 (1943). "A covenant to insure may never be implied and will be imposed only where it is found in the agreement in clear and explicit language." *Id.* (citing Story on Bail-

ments, 9th Ed., § 35; 6 Am.Jur., Bailments § 180). Fundamental principles of insurance law make clear that, as a necessary prerequisite to recovery upon an insurance policy, the insured must show that a claim is within the coverage provided by the policy. *Miller v. Boston Ins. Co.*, 420 Pa. 566, 218 A.2d 275 (1966). It is also well settled that a jury cannot be allowed to reach its verdict on the basis of speculation or conjecture. *Thomas v. Duquesne Light Co.*, 376 Pa.Super. 1, 545 A.2d 289 (1988), *affirmed,* 528 Pa. 113, 595 A.2d 56 (1991).

¶ 28 In the instant case, the parties do not dispute that a loss occurred or that Exodus charged for insurance coverage as part of its storage fee. Appellant admitted no proof to support her contention that Exodus was the absolute insurer of her goods regardless of when the damage occurred.[8] On the other hand, Mr. Gilbert testified for Exodus, stating unequivocally that their insurance provided protection only from the time the goods were transferred to Exodus until they were delivered to Appellant. Therefore, to recover under Exodus' insurance policy, Appellant had to show that the damage to her goods was of the kind covered by the policy and that her loss occurred during the policy period. Appellant admitted evidence in her case in chief that she did not know when the damage occurred and that it could have occurred sometime before Exodus took possession of her goods. The trial court informed counsel, and we agree, that under the facts of this case, there was no burden shifting on the insurance issue. *See Wexler Knitting Mills v. Atlantic Mut. Ins. Co.*, 382 Pa.Super. 405, 555 A.2d 903 (1989) (stating that existence of facts constituting an exception or exclusion to insurance coverage admitted in plaintiff's case removes burden from insurer to show applicability of exception or exclusion). Having failed to carry her burden as to

---

8. Appellant testified that her goods had also been covered under an insurance policy while stored with Ryan & Christie. She admitted that she had not filed a claim with that insur-

er on account of the damage to her goods. (N.T., 4/22/98, at 65). In fact, the conditions of the prior policy excluded coverage for a substantial portion of the alleged damage.

when the damage occurred or how much of the damage occurred under Exodus' supervision, Appellant simply did not establish her right to recover under Exodus' insurance policy. Thus, the trial court correctly entered judgment in favor of Exodus.

¶ 29 Based upon the foregoing, we hold that Appellant was unable to meet her burden of proof at trial against a subsequent bailee merely by showing an original bailment of her personalty in good condition with a prior bailee and the return of her personalty in damaged condition from a subsequent bailee. Moreover, we hold that Exodus, the subsequent bailee, cannot be construed as an absolute insurer of all damage to Appellant's goods, where Appellant admitted no proof to support this contention. Accordingly, we affirm the judgment in favor of Exodus.

¶ 30 Judgment affirmed.