**Andreassen v. Saf-Gard Safety
Shoe Company Inc.**

*Jaime D. Jackson,* for plaintiff.
*Mary F. Dixon,* for defendant Saf-Gard.

QUINONES ALEJANDRO, *J.,* September 29, 2005—

## INTRODUCTION

These above-captioned appeals arise from a jury verdict in a strict products liability civil action, involving "molder's boots," in favor of Scott C. Andreassen, plaintiff, and against defendants Saf-Gard Safety Shoe Company Inc., and Weinbrenner Shoe Company Inc., and from this trial judge's denial of post-trial motions for judgment notwithstanding the verdict. After the filing of these appeals and prior to the submission of this opinion, Weinbrenner Shoe Company reached an out-of-court settlement agreement with plaintiff. Consequently, the appellate issues previously set forth by Weinbrenner Shoe Company are deemed moot and will not be addressed. The appellate issues addressed in this opinion are those presented by Saf-Gard Safety Shoe Company Inc., defendant.

## RELEVANT FACTUAL AND
## PROCEDURAL HISTORY

Based upon the evidence presented during the trial, it is reasonable to infer that the jury considered the following relevant facts when rendering its verdict:

"Sometime in November of 2001, plaintiff was hired by Lancaster Malleable Casting Company, a foundry (not a party to this matter) as a part-time shifter.[1] This foundry handles metals at extremely high temperatures to mold into a final product.

"On June 30, 2002, the day of the accident, plaintiff held the position of a 'bull puller,'[2] responsible for transporting molten metal from the furnace to the mold using a 'bull.'[3] Plaintiff described the workplace as follows: generally, bulls are placed in rows, one next to each other, in front of furnaces[4] where the iron is melted. Once the bulls are filled with molten metal, the worker or *bull puller* pulls the bull using its two handles away from the furnace and to another location in the foundry, as directed by the heat directors.[5] This process concludes with the pouring of the melted iron into particular molds located on specific floors, where the cooled molds are then sifted for the final product.[6]

"On the date of the accident, plaintiff arrived at the foundry and outfitted himself with a bandanna to pull

1. N.T. 2/24/05 at 11:3-21.
2. *Id.* at 17:2.
3. *Id.* at 20:7-21.
4. *Id.* at 11:9-14.
5. *Id.* at 20:21-25.
6. *Id.* at 14:12-15.

his hair back, safety goggles, sleeves, gloves, leggings, earplugs, and boots.[7] Plaintiff identified these boots, the subject of this litigation, as the TG2118 boots, also known as 'molder's boots,'[8] made of leather with a steel toe and a loose-fitting elastic along the top of the boot[9] for easy 'kick off' should anything get inside the boots.[10] These molder's boots, which were recommended by his employer, were manufactured and advertised as 'molder's' boots by Weinbrenner Shoe Company, a manufacturer of footwear since 1892,[11] and sold by Saf-Gard Safety Shoe Company Inc., a retailer and specialist in providing footwear to certain customers[12] and expert advice to companies regarding industry shoe trends and the technologies offered by those companies.[13]

"After plaintiff outfitted himself with the appropriate gear and his bull was filled with molten iron, he began to pull (backwards) the bull towards another location in the foundry, as instructed by the heat director.[14] Directly behind plaintiff, a co-worker was slowly pulling another bull. As plaintiff slowed down to avoid running into the co-worker, plaintiff tripped over an incline on the plant floor.[15] The bull hit the right side of his back foot caus-

---

7. N.T. 2/24/05 at 17:9-16.

8. A *molder* is an individual who works in a foundry with metal castings and pours molten metal into various molds to fabricate a final product.

9. N.T. 2/24/05 at 15:10-18.

10. N.T. 2/22/05 at 133:16-19.

11. N.T. 2/25/05 at 8:15-16.

12. N.T. 2/22/05 at 113:2-5.

13. *Id.* at 113:20-24.

14. N.T. 2/24/05 at 17:9-16; 20:21-25.

15. *Id.* at 21:1-7.

ing plaintiff to lose control of the bull[16] and the hot melted iron to spill onto the floor.[17] At the sight of the spill, plaintiff tried to avoid it by running through the hot iron. Plaintiff ran to a hallway, in the opposite direction of where the molders were located, and removed his left boot.[18] Unfortunately, some of the hot molten iron spilled onto his boot and burned through the goring (elastic) material covering his left ankle.[19] Plaintiff did not suffer any injuries to his right foot and/or ankle.

"Plaintiff was immediately taken to Lancaster General Hospital by Thomas Martone, the vice-president of personnel and safety of Lancaster Malleable,[20] and Carmelo Mendez, the lead person in the heat molding department.[21] He was initially treated and given morphine, then transferred to the Crozer-Chester Burn Center, where he remained hospitalized for approximately three weeks.[22] During this hospitalization, he received extensive treatment, including a skin graft.[23]

"Plaintiff has undergone numerous surgeries on his left foot, including additional skin grafts procedures and a surgery to separate his toes.[24] In addition and periodically, the scar tissue on his foot breaks open causing him pain and discomfort.[25] As a result of these injuries, plain-

---

16. *Id.* at 21:8-12.
17. N.T. 2/24/05 at 21:12-14.
18. *Id.* at 2/24/05 at 21:14-16; 21:23-24.
19. *Id.* at 21:22-24.
20. *Id.* at 22:9-12.
21. *Id.* at 22:3-6.
22. *Id.* at 23:16-25.
23. *Id.* at 25:7-8.
24. *Id.* at 31:13-16.
25. *Id.* at 39:12-18; 45:21-25.

tiff claims that he is unable to stand for a long period of time in one location."[26]

Procedurally, on January 8, 2003, plaintiff filed a strict products liability action against numerous defendants,[27] including the aforementioned defendant. A seven-day trial commenced on February 21, 2005, and concluded with a jury verdict in favor of plaintiff and against defendants Saf-Gard Safety Shoe Company Inc., and Weinbrenner Shoe Company Inc., in the amount of $808,333.33.

On March 8 and 17, 2005, defendant and Weinbrenner Shoe Company, respectively, filed post-trial motions requesting judgment n.o.v. On March 28, 2005, plaintiff filed a petition for delay damages. Oral argument on these motions was heard on April 28, 2005, and by distinct orders dated May 5, 2005, this trial judge denied the requests for judgment n.o.v. and granted *in part* plaintiff's petition for delay damages.[28]

On May 13, 2005, a final judgment was entered on the verdict of record. On June 3 and 6, 2005, defendant and Weinbrenner Shoe Company filed their respective

---

26. *Id.* at 40:8-9.

27. Prior to the commencement of trial, the claims against defendants Airgas Safety and Steel Grip Inc. were dismissed by motions for summary judgment; and the claims against defendants Airgas Inc., Stanco Manufacturing Inc., and Chicago Protective Apparel Inc. were dismissed by stipulation.

28. By a separate order dated May 5, 2005, this trial judge granted, *in part,* plaintiff's amended petition for delay damages and molded the verdict to reflect delay damages in the amount of $46,257.71 for a total verdict award of $854,591.03.

appeals.[29] As stated, Weinbrenner Shoe Company, thereafter, settled with plaintiff.

## ISSUES

In response to an order issued in accordance with Pennsylvania Rule of Appellate Procedure 1925(b), defendant, on June 24, 2005, filed of record a statement of matters complained of on appeal and essentially argued that this trial judge erred:

"(1) in not granting judgment n.o.v.:

"(a) because the molder's boots were not unreasonably dangerous;

"(b) on the basis that defendant was entitled to, inter alia, common-law indemnity from the manufacturer;

"(c) on the basis that defendant is not liable as a matter of law on plaintiff's 'inadequate warning' claim in this strict products liability action;

"(d) where there was no duty to warn because the purported defect was 'open and obvious';

"(e) in that the evidence established that, even if a proper warning would have been provided, it would not have been heeded;

"(f) in that the verdict was against the weight of the evidence since the evidence established that plaintiff voluntarily assumed the risk of harm; and

---

29. On June 3, 2005, defendant Saf-Gard filed an emergency motion for modification of security in order to effect a supersedeas pending appeal and for a temporary stay of any execution proceedings. This trial judge denied said motion by order dated June 9, 2005.

"(g) there was insufficient evidence as to how the injury occurred.

"(2) in precluding defendant from utilizing the 'sophisticated user' defense;

"(3) in precluding evidence that the molder's boots met OSHA guidelines and other industry regulations; and

"(4) in permitting plaintiff to introduce negligence concepts against defendant."

## LAW AND DISCUSSION

Essentially, defendant argues that this trial judge committed numerous errors when denying its post-trial motion for judgment n.o.v. This trial judge disagrees.

It is acknowledged that a judgment n.o.v. may be entered where: (1) the moving party is entitled to judgment as a matter of law and/or (2) the evidence is such that no two reasonable minds could disagree that the verdict should have been rendered for the moving party. *Haddad v. Gopal,* 787 A.2d 975, 979 (Pa. Super. 2001), *appeal denied,* 572 Pa. 705, 813 A.2d 842 (2002). A trial court's decision granting or denying judgment n.o.v. will be subject to the appellate court's scrutiny to determine whether there is sufficient competent evidence to sustain the verdict. *Carrozza v. Greenbaum,* 866 A.2d 369, 379 (Pa. Super. 2004); *Kennedy v. Sell,* 816 A.2d 1153, 1156 (Pa. Super. 2003). The appellate court will review all of the evidence in the light most favorable to the verdict winner and will give that party the benefit of every reasonable inference arising from that evidence while rejecting all unfavorable testimony and inferences. *Birth Center v. St. Paul Companies Inc.,* 567 Pa. 386, 397, 787 A.2d

376, 383 (2001); *Haddad,* 787 A.2d at 979. The appellate court's scope of review is plenary concerning any questions of law. *Id.* Regarding questions of credibility and the weight accorded the evidence at trial, however, the court will not substitute its judgment for that of the fact-finder. *Cruz v. Northeastern Hospital,* 801 A.2d 602, 607 (Pa. Super. 2002), citing *Buckley v. Exodus Transit & Storage Corp.,* 744 A.2d 298, 304-305 (Pa. Super. 1999). Questions relating to the weight to be given certain evidence and the credibility of the evidence are entirely within the scope of the jury's fact-finding position. *Drevers v. Booz,* 296 Pa. Super. 612, 440 A.2d 1244 (1981). It is the jury's exclusive duty to resolve conflicting testimony and assign the weight to be given individual testimony. *Smith v. Brooks,* 394 Pa. Super. 327, 344, 575 A.2d 926, 935 (1990). Judgment n.o.v. should be entered only "in a clear case, and any doubts must be resolved in favor of the verdict winner." *Birth Center,* 567 Pa. at 397, 787 A.2d at 383. (citation omitted)

## Unreasonably Dangerous

In its first appellate argument, defendant contends that this trial judge erred in allowing the issue of whether the "molder's boots" were unreasonably dangerous to go to the jury. That is, defendant argues that this trial judge erred in determining that, under the circumstances of this case, recovery would be justified.

Briefly, this trial judge notes that a claim of strict liability is a theory of recovery under which a plaintiff may obtain damages for harm caused by a product rendered unreasonably dangerous by a defective condition. *Charlton v. Toyota Industrial Equipment,* 714 A.2d 1043,

1046 (Pa. Super. 1998). Any recovery is predicated on the plaintiff's ability to demonstrate not only the defective state of the product, but also that the defect was a substantial cause of the injury. *Id.* That is, "the concept of strict liability allows a plaintiff to recover where a product in a defective condition, unreasonably dangerous to the consumer or user, causes harm to the plaintiff." *Spino v. John S. Tilley Ladder Co.,* 548 Pa. 286, 293, 696 A.2d 1169, 1172 (1997) (citations omitted); Restatement (Second) of Torts (1965), §402(A), comment i.[30]

Here, for plaintiff to recover under his strict liability theory, he must prove that the molder's boots were sold in a defective condition which rendered them unreasonably dangerous, and that this defective condition was the proximate cause of his injuries. See *Hutchinson v. Penske Truck Leasing Co.,* 876 A.2d 978, 979 (Pa. Super. 2005),

---

30. This section of the Restatement (Second) of Torts has been adopted as the law of this Commonwealth, *Schindler v. Sofamor Inc.,* 774 A.2d 765, 771 n.1 (Pa. Super. 2001), citing *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966), and provides as follows:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without a substantial change in the condition in which it is sold.

"(2) The rule stated in subsection (1) applies though

"(a) the seller has exercised all possible care in the preparation and a sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

citing *Lewis v. Coffing Hoist Division, Duff-Norton Co. Inc.,* 515 Pa. 334, 340, 528 A.2d 590, 592 (1987); *Azzarello v. Black Brothers Co. Inc.,* 480 Pa. 547, 559, 391 A.2d 1020, 1027 (1978). A product is defective when it is not safe for its intended use because of a defect in its design or manufacture. *Id.* It can also be defective if it lacks adequate warnings of danger involved in its use. *Fravel v. Suzuki Motor Co.,* 337 Pa. Super. 97, 104, 486 A.2d 498, 502 (1984).

In a product liability matter, it is a judicial function to decide whether, considering a plaintiff's version of the facts, recovery would be justified; and only after this judicial determination is made is the cause of action submitted to the jury to determine whether the facts of the case support the allegations in the complaint. *Schindler v. Sofamor Inc.,* 774 A.2d 765, 771 (Pa. Super. 2001), citing *Azzarello,* 480 Pa. at 558, 391 A.2d at 1026. When a judicial determination has been made that recovery would be justified, a jury may find a defect existed when the product left the supplier's control lacking any element necessary to make it safe for its intended use, or possessing any feature that renders it unsafe for the intended use. *Id.* (citations omitted) Determining the product's intended purpose is critical to the trial court's legal conclusions whether the product can be deemed defective. *Id.* (citation omitted) The trial court will necessarily make different conclusions about the risk-utility of a product depending on whether the court construes the intended purpose of a product broadly or narrowly. If the trial court is to properly discharge its duty as a social philosopher and a risk-utility economic analyst, it must be afforded some measure of latitude to

determine the intended purpose of a product. It follows that the intended use of a product is a conclusion of law, to be decided by the trial court. *Id.* Notwithstanding, the trial court is not bound by either party's legal conclusions as to the intended purpose of a product, even if those conclusions are couched as averments of fact or presented as expert evidence. To hold otherwise would force trial courts (and reviewing courts) to accept unrealistic, generalized, or distorted views of a product's purpose simply because they are presented as factual evidence. *Id.*

Here, as to the judicial determination of whether the "molder's boots" involved in this matter were unreasonably dangerous for their use, this trial judge considered inter alia the following evidence:

• Plaintiff was employed in a foundry working around and with extremely hot material, namely, molten metal which was submitted to temperatures above 2800 degrees Fahrenheit;[31]

• Plaintiff was required to wear molder's boots while in the foundry. The molder's boots recommended by the employer were made of leather with an elastic gorge covering the ankle area. This elastic covering, which could easily be burned with an ignited match, was designed for easy kick off in the event any hot substance got inside the boot. These molder's boots did not incorporate into its desin protection for its wearer against the hazards of burn injuries from molten metal;[32]

---

31. N.T. 2/23/05 at 14:21-23.
32. *Id.* at 89:4-13.

• The boots at issue were advertised as "molder's boots" for people who worked in a foundry. Defendant sold these boots knowing that these would be used in a foundry which dealt with melting and molten metal;[33]

• Defendant held itself out as a "safety shoe specialist" and an expert on shoe technologies;[34] and

• No warning on the use of these molder's boots accompanied the boots.[35]

It is undisputed that the intended use of these molder's boots was as footwear for individuals who worked in a foundry. Although there are many kinds of foundries, defendant knew that Lancaster Malleable Foundry dealt with extremely hot melted iron and that someone, such as plaintiff, was responsible for transporting the melted cores in a bull from the furnace area to another section of the foundry where the molds were located.[36] Defendant also knew that the temperature of the heated iron was approximately 2800°F.[37] Defendant was aware of this process yet did not advise against the use of these molder's boots in this plant nor of the inherent dangers of the use of these boots under the circumstances. Against the backdrop of evidence regarding the composition of these molder's boots, their use in this particular foundry, and the legal standard established by case law, this trial judge opines that no error was committed in allowing the issue of whether the molder's boots were defective

---

33. N.T. 2/22/05 at 115:2-9.
34. *Id.* at 113:12-19.
35. N.T. 2/25/05 at 60:21-25.
36. N.T. 2/23/05 at 12:15-19.
37. N.T. 2/23/05 at 14:21-23.

to go to the jury for their determination. The facts in this case support this trial judge's determination that the molder's boots were unreasonably dangerous for use in this particular foundry which deals with extremely hot molten metal. It was for the jury to determine whether the molder's boots were defective because these were unsafe for their intended use and/or because the "molder's boots" lacked adequate warnings to someone, like plaintiff, that these should not be used around melting iron. In this trial judge's opinion, defendant's appellate contention is without merit.

## Indemnification

Next, defendant asserts that it is entitled to common-law indemnity from Weinbrenner Shoe Company, the manufacturer of the molder's boot, since Weinbrenner Shoe Company also failed to issue adequate warnings about the molder's boots. This trial judge disagrees and notes that defendant waived this issue by never requesting a charge on indemnity. See: transcript of notes of testimony, volume 4, February 28, 2005, p. 46, ll. 6-18.

Notwithstanding this trial judge's opinion that defendant waived this argument, the right of indemnity arises only when a person or entity secondarily liable has been compelled, by reason of some legal obligation, to pay damages occasioned by the negligence of the party which should be primarily liable. *Automatic Time & Control Co. v. ifm Electronics, GmBh,* 410 Pa. Super. 437, 439, 600 A.2d 220, 222 (1991), citing *Sirianni v. Nugent Bros.,* 509 Pa. 564, 506 A.2d 868 (1986). "Primary" liability can only rest upon a fault by the person or entity prima-

rily responsible for a defect or a dangerous condition in the product. *Id.* (citation omitted) In order to determine primary responsibility, the court should look at factors such as active or passive negligence and knowledge of or opportunity to discover or prevent the harm. *Id.* In Pennsylvania, joint tort-feasors, including those in strict liability actions, are jointly and severally liable. *Andalaro v. Armstrong World Industries,* 799 A.2d 71, 81 (Pa. Super. 2002). If a defect is found to be a substantial factor in causing an indivisible injury, . . . then, absent a reasonable basis to determine which wrongdoer actually caused the harm, the defendants should be treated as joint and several tort-feasors. *Stecher v. Ford Motor Co.,* 571 Pa. 311, 812 A.2d 553, 556 (2002). In this case, it is this trial judge's opinion that defendant would not be entitled to any indemnity.

Furthermore, after carefully considering all the evidence, the jury determined that the molder's boots were defective; that the defective nature of these boots was a substantial factor in bringing about plaintiff's harm; and that both defendant and Weinbrenner Shoe Company failed to provide adequate warnings regarding the boots. However, the jury found that only defendant's failure to provide adequate warning was a substantial factor in bringing about plaintiff's harm.

In considering defendant's *active* participation in the sale of the molder's boots was, the evidence showed; to wit:

• Representative from defendant repeatedly approached Lancaster Malleable Foundry seeking their business;[38]

---

38. N.T. 2/22/05 at 120:15-19.

• Defendant advertised the boots as "molder's boots" to the management and employees of Lancaster Malleable Foundry;[39]

• Defendant sent the purchasing director of Lancaster Malleable a letter specifically stating that the "molder's boots" worked well in foundries;[40]

• According to the president of Weinbrenner Shoe Company, defendant did not make any inquiries as to the "molder's boots" being used in foundries;[41] and

• Defendant never warned nor advised anyone that these boots were not intended as protective gear against molten metal in a foundry.[42]

Relying on the totality of evidence presented, in this trial judge's opinion, defendant was actively involved in the sale and promotion of these molder's boots to plaintiff's employer, and ultimately, to the employees. As a specialist in safety shoes, defendant understood the dangers of the use of these boots in a metal foundry, yet did not discourage their use. Defendant cannot now plea lack of responsibility for the injuries suffered by plaintiff. Therefore, in this trial judge's opinion defendant is not entitled to indemnification.

### Inadequate Warning

Defendant next argues that this trial judge erred in denying its motion for judgment n.o.v. on the basis that:

---

39. N.T. 2/22/05 at 120:20-25.
40. N.T. 2/22/05 at 123:12-25; 124:1-10.
41. N.T. 2/22/05 at 123:12-25; 124:1-10.
42. N.T. 2/22/05 at 117:6-9.

(1) as a matter of law, defendant is not liable on the "inadequate warning" claim; (2) defendant had no duty to warn because the purported defect was "open and obvious"; and (3) the evidence established that, even if a proper warning would have been provided, the warning would not have been heeded.

Reiterating, to recover under a strict liability theory, a plaintiff must prove that the product was sold in a defective condition, rendering it unreasonably dangerous, and that the defect was the proximate cause of plaintiff's injuries. A product can be considered "defective" for strict liability purposes if it is distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product. *Davis v. Berwind Corporation,* 547 Pa. 260, 267, 690 A.2d 186, 190 (1997), citing *Mackowick v. Westinghouse Electric Corporation,* 525 Pa. 52, 575 A.2d 100 (1990); see also, Restatement (Second) of Torts §402A, comment h.

As previously discussed, the determination of whether a warning is adequate and whether a product is "defective" due to inadequate warnings are questions of law to be answered by the trial judge. *Id.* Such warnings must be directed to the understanding of the intended user. *Mackowick,* 525 Pa. at 58, 575 A.2d at 103. (citations omitted) The duty to adequately warn does not require the manufacturer to educate a neophyte in the principles of the product. *Weiner v. American Honda Motor Co.,* 718 A.2d 305, 310 (Pa. Super. 1998). A warning of inherent dangers is sufficient if it adequately notifies the intended user of the *unobvious* dangers inherent in the product. *Mackowick,* 525 Pa. at 56, 575 A.2d at 102. A seller must give such warning and/or instructions as are

required to inform the user or consumer of the possible risks and inherent limitations of his product. *Berkebile v. Brantly Helicopter Corporation,* 462 Pa. 83, 100, 337 A.2d 893, 902 (1975), citing Restatement (Second) of Torts (1965), §402(A), comment h. The seller/manufacturer is liable for harm caused by a defective product even if he "has exercised all possible care in the preparation and sale of his product." *Carrecter v. Colson Equipment Co.,* 346 Pa. Super. 95, 102, 499 A.2d 326, 329 (1985). "It must be emphasized that the test of the necessity of warnings or instructions is not to be governed by the reasonable man standard . . . [or] what the 'reasonable' consumer could be expected to know, or what the 'reasonable' manufacturer could be expected to 'foresee' about the consumers who use his product." *Berkebile,* 462 Pa. at 101, 337 A.2d at 902. (citations omitted) As a guarantor of its product, the duty to warn of any defects extends to the ultimate users and notice to a third party of such warnings will not serve to make the user aware of the defect in the product. *Sheehan v. Cincinnati Shaper Co.,* 382 Pa. Super. 579, 585, 555 A.2d 1352, 1355 (1989).

As to this issue, the question for the jury to determine is whether the seller accompanied the product with sufficient instructions and warnings so as to make the product safe. *Sheehan,* 382 Pa. Super. at 585, 555 A.2d at 1355. The necessity and adequacy of warnings in determining the existence of a defect can and should be considered with a view to all the evidence. The jury should also view the relative degrees of danger associated with the use of the product since a greater degree of danger requires a greater degree of protection. *Id.* (citation omitted)

Plaintiff presented evidence that defendant represented itself as not only a retailer and supplier of the molder's boots in question, but that it also was a "safety specialist" and "expert" on safety shoes.[43] Defendant's argument that it has no liability for failing to warn about the potential dangers of wearing these molder's boots with elastic goring material in an area where molten metal is poured is not supported by the evidence. More so Lancaster Malleable's safety manager, Tom Martone, opined that the molder's boots sold by defendant *were* suitable for use in the foundry.[44] (emphasis added) As safety experts in the shoe industry, defendant was in a position to advise Mr. Martone to the contrary and warn him of the limited protection these boots afforded around molten metal. The fact that Mr. Martone acknowledged awareness of the existence of a different boot that may have offered additional protection to plaintiff is irrelevant. What is relevant is whether plaintiff had adequate warnings regarding the use of the molder's boots in the situation he found himself. The law of strict liability places the product *itself* on trial. *Phillips v. Cricket Lighters,* 576 Pa. 644, 655, 841 A.2d 1000, 1006 (2003). That is, the focus of this determination is on the product and not on the conduct of the manufacturer, *Ellis v. Chicago Bridge & Iron Co.,* 376 Pa. Super. 220, 226, 545 A.2d 906, 909 (1988), or anyone else. The evidence supports the jury finding that plaintiff did not have adequate warning on the use of these boots under the circumstance of this case.

43. N.T. 2/25/05 at 158:21-24.
44. N.T. 2/23/05 at 17:5-9.

Defendant also argues that it had no duty to warn against open and obvious dangers. In response, plaintiff maintains that the facts of this case do not support the assertion that the inherent danger of the molder's boots was open and obvious. Plaintiff further contends that the boots were advertised by Weinbrenner Shoe Company and marketed by defendant, a "safety shoe expert," as being "molder's boots,"[45] and were sold by defendant to Lancaster Malleable as being suitable for use knowing that the employees would be working with molten metal.[46] Relying on defendant's representation, according to plaintiff, he was not aware of any protective limitation inherent to these boots when worn in the foundry.

Lastly, defendant posits that, even if a warning had been issued, it would not have been heeded since several witnesses testified that they used these boots primarily because of their quick "kick-off" feature. Notwithstanding, *plaintiff* testified that, had the molder's boots come with a warning to not wear these around molten metal, *he* would *not* have used them.[47] (emphasis added) In light of this evidence, this trial judge is of the opinion that the issue of failure to warn was properly determined by the jury and, based on the evidence presented, the finding that defendant failed to warn of its inherent dangers should not be disturbed. It is the jury's prerogative to assess the credibility of the witnesses, and clearly the jury chose to believe plaintiff's testimony that he would not have worn these boots had he known of their inher-

---

45. N.T. 2/28/05 at 121:21-23.
46. N.T. 2/22/05 at 115:5-9.
47. N.T. 2/24/05 at 16:8-11.

ent danger. As such, in this trial judge's opinion, defendant's request for a judgment n.o.v. is not warranted.

## Assumption of Risk

Relying on the doctrine of voluntary assumption of the risk as an affirmative defense, defendant next argues that plaintiff should be barred from recovering any damage suffered. Generally, negligence concepts are inimical to strict liability claims and cannot be used to excuse a defective product and/or to reduce recovery by comparing fault. *Kimco Development Corp. v. Michael D's Carpet Outlets,* 536 Pa. 1, 6, 637 A.2d 603, 606 (1993). However, where the defense offers evidence to show that the accident at issue was *solely* the result of the plaintiff's conduct, and not the defective product, plaintiff's negligence conduct is relevant and admissible for proving causation. *Jara v. Rexworks,* 718 A.2d 788, 793 (Pa. Super. 1999), *appeal denied,* 558 Pa. 620, 737 A.2d 743 (1999). That is, a user's negligence is not relevant if the product defect contributed in any way to the harm suffered. *Madonna v. Harley Davidson Inc.,* 708 A.2d 507, 509 (Pa. Super. 1998).

In its simplest form, the doctrine of assumption of risk provides that a plaintiff consents to relieve a defendant of an obligation to exercise care for plaintiff's protection, and agrees to take a chance(s) of injury from a known or possible risk. *Hughes v. Seven Springs Farm Inc.,* 563 Pa. 501, 504, 762 A.2d 339, 341 (2000). The *Hughes* court recognizes that some courts have advocated the abolition of the doctrine entirely except where expressly preserved by statute, in case of expressed assumption of risk, or strict liability cases brought under

402A Restatement. *Hughes,* 563 Pa. at 507, 762 A.2d at 342. See also, *Howell v. Clyde,* 533 Pa. 151, 162, 620 A.2d 1107, 1113 (1993) (holding that the assumption of risk doctrine is a valid affirmative defense in strict liability case pursuant to section 402A). However, the determination that a plaintiff has assumed the risk of injuries such that recovery is prevented should occur only where it is beyond question that the plaintiff voluntarily and knowingly proceeded in the face of an obvious and dangerous condition. *Barrett v. Fredavid Builders Inc.,* 454 Pa. Super. 162, 166, 685 A.2d 129, 131 (1996), citing *Struble v. Valley Forge Military Academy,* 445 Pa. Super. 224, 665 A.2d 4 (1995). Before the doctrine of assumption of risk will be applied to prevent recovery, the evidence must establish conclusively that the plaintiff was subjectively aware of the risk. *Barrett,* 454 Pa. Super. at 168, 685 A.2d at 131.

Here, defendant had an opportunity to prove its affirmative defense that plaintiff *himself* had assumed risk of using these molder's boots.[48] (emphasis added) Defendant presented evidence that plaintiff knew what the molder's boots were made of, the boots' components, that he had some reservation using these boots, that he questioned to himself the protection (or lack thereof) these boots offered him in the setting of the foundry, and that, despite his reservations, he used them when he did the task of bull-pulling.[49]

In addition, this trial court judge charged on and defined for the jury the doctrine of assumption of risk and

---

48. N.T. 2/22/05 at 16:12-13.
49. N.T. 2/22/05 at 62:19-25; 63:1-18.

its consequences.[50] Specifically, the jury was asked, in the verdict form, question number seven: "Do you find that the plaintiff knew of the defect, appreciated its danger and voluntarily chose to use the TG2118 boots [the molder's boots] thus, assuming the risk of use?"[51] After carefully evaluating the evidence and the totality of circumstances, the jury returned the verdict form wherein they answered "no" to question number seven.[52]

In light of their findings, it is obvious that the jury did not accept defendant's affirmative defense and, further, did not believe that plaintiff was subjectively aware of the inherent risks that the molder's boots presented when working with or around hot iron. The issue of voluntariness of the risk and the plaintiff's knowledge of the risks are for the jury's determination. *Long v. Norriton Hydraulics Inc.,* 443 Pa. Super. 532, 536, 662 A.2d 1089, 1091 (1995), *appeal denied, Long v. Norriton Hydraulics Inc.,* 544 Pa. 611, 674 A.2d 1074 (1996). More so, when plaintiff's employer recommended the use of these boots to its employees. A plaintiff's use of dangerous machinery is dictated by the terms of his employment, and it would be absurd for this court to hold that he unreasonably and voluntarily used a product he was directed by his superiors to use. *Di Salvatore v. United States,* 499 F. Supp. 338, 346 (1980). As stated, questions relating to the weight to be given certain evidence and the credibility of the evidence are entirely within the scope of the jury's fact-finding position.

---

50. N.T. 2/28/05 at 28:11-25; 29:1-20.
51. *Id.* at 40:20-23.
52. *Id.* at 49:20-25.

*Drevers v. Booz,* 296 Pa. Super. 612, 440 A.2d 1244 (1981). The jury's exclusive duty is to resolve conflicting testimony and assign the weight to be given individual testimony. *Smith v. Brooks,* 394 Pa. Super. 327, 344, 575 A.2d 926, 935 (1990). Although defendant attempted to prove that plaintiff assumed the risk of using these molder's boots, this defense was not accepted by the jury. Consequently, in this trial judge's opinion, plaintiff is not precluded from recovering his damages.

## Industry Guidelines

In its final argument, defendant claims that this trial judge incorrectly excluded evidence that the boots met OSHA and other industry guidelines and regulations; and erred in excluding relevant negligence concepts, such as comparative negligence and the sophisticated user concept.[53] This trial judge disagrees since these allegations of error relate to negligence principles or conduct, which clearly are factors that have no place in a strict liability context. See *Phillips,* 576 Pa. at 655, 841 A.2d at 1006.

---

53. Section 388 of the Restatement (Second) of Torts, (Chattel known to be dangerous for intended use) otherwise known as the sophisticated user doctrine, provides as follows:

"One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which it is supplied, if the supplier:

"(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

"(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

"(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

Indeed, the Restatement (Second) of Torts, §402A, provides that the imposition of strict liability for a product defect is not affected by the fact that the manufacturer or other supplier has exercised all possible care. *Id.* This approach is militated by the fact that our strict liability law places the product itself on trial, and not the manufacturer's conduct. Accord *Kimco Development Corp. v. Michael D's Carpet Outlets,* 536 Pa. 1, 8, 637 A.2d 603, 606 (1993) which held that "we have been adamant that negligence concepts have no place in a strict liability action." Evidence of due care by a defendant is both irrelevant and inadmissible in a products liability case since a manufacturer may be strictly liable even if it used the utmost care. *Spino,* 548 Pa. at 293, 696 A.2d at 1172. Industry standards and practices are also inadmissible in strict liability actions because they improperly inject negligence principles. *Lewis v. Coffing Hoist Division, Duff-Norton Co. Inc.,* 515 Pa. 334, 343, 528 A.2d 590, 594 (1987).

Without a doubt, the case law and the Restatement of Torts cited supports this trial judge's ruling that concepts of comparative negligence, "sophisticated user," [54] contributory negligence, and OSHA guidelines and other industry regulations, may not be asserted as a defense in strict product liability actions. Consequently, defendant's argument that this trial judge erroneously excluded this particular evidence, all which encompass negligence concepts, is without merit. In this trial judge's opinion

54. In *Phillips v. A-Best Products Co.,* 542 Pa. 124, 665 A.2d 1167 (1995), the court declined to discuss the "sophisticated user" defense in the context of strict liability law. See *id.* at 133, 665 A.2d at 1172.

no error was committed when denying defendant's post-trial motion on these issues.

## CONCLUSION

Based upon the above analysis and case law, this trial judge is of the opinion that no error was committed in denying defendant's post-trial motion. This trial judge respectfully requests that defendant's appeal be dismissed and that the orders dated May 5, 2005, be affirmed.