# Nertavich v. PPL Electric Utilities

354

*James B. Dilsheimer*, for plaintiff
*Luke A. Repici, Andrew F. Susko* and *Edward M. Koch*, for defendants

BERNSTEIN, *J.*, June 14, 2013—Plaintiff Vincent Nertavich, Jr. suffered catastrophic injuries when he fell 40 feet from a electric transmission pole that he was painting owned by defendant PPL. He sued defendant PPL and the manufacturer of the ladder he used to climb the pole, defendant Thomas & Betts Corporation. After

an eleven day trial, the jury found in favor of the plaintiff and against defendant PPL in the amount of $4,613,150. The jury found plaintiff 49 percent causally negligent and defendant PPL 51 percent causally negligent. Defendant Thomas & Betts was found not liable. Defendant PPL makes this timely appeal.

Defendant PPL owns 90-foot-high, 10-foot-in circumference tubular steel electric transmission poles. Some of these poles need to be repainted from time to time to prevent structural decay. PPL contracted with QSC Corporation, plaintiff's employer, to paint the poles. The contract called for work to begin in August 2007 and be completed by November 2007.[1] It directed that "[a]ll work shall be performed according to the attached PPL EU 'Specification for the Maintenance Painting of Transmission Structures' revision dated 8/3/07."[2]

That PPL specification document contained a variety of detailed requirements about the job. It prescribed each step how to paint the poles. The paint, a special type specified in the contract, would arrive at the worksite compounded and ready for use, could only be thinned with the approval of PPL's field representative, and had to be mixed and stirred frequently.[3] First, the poles had to be cleaned and dried.[4] Tarps had to be laid out on the ground

---

1. Contract for transmission structure painting between PPL Electric Utilities Corp. and QSC Painting, Aug. 30, 2007, pg. 1 (Ex. P-83).

2. Attachment A to contract for transmission structure painting between PPL Electric Utilities Corp. and QSC Painting, Aug. 30, 2007, ¶1 (Ex. P-83).

3. Specification for the maintenance painting of transmission structures, Aug. 3, 2007, appended to contract for transmission structure painting between PPL Electric Utilities Corp. and QSC Painting, Aug. 30, 2007, §§8.2, 8.3, 8.4 (Ex. P-83).

4. Specification for the maintenance painting of transmission structures §8.5 (Ex. P-83).

beneath the poles in all directions to catch debris.[5] Before painting QSC workers were to clean and prepare the poles with solvents, hand tools, and power tools so that no loose rust, dirt, oil, or other material was on the pole.[6] Second, the poles were to be painted:

> Paint shall be applied by roller, brush, and/or mitt. When brushing is used, all brush marks and laps shall be concealed and joints between successive days' work shall not be visible. All paint shall be applied without runs or sagging of the paint. Additional coats shall be applied when undercoats, stains, or other conditions show through the final coat of paint, until the paint film is of uniform finish, color, appearance and thickness.[7]

The workmen were to be extremely careful to paint all hard to reach surfaces.[8] They could only use spray paint with approval of PPL's authorized representative, and even then the representative could require the workers to demonstrate the painting method first.[9] All of the workmen's tools were subject to PPL's authorized representative's inspection, and the representative could require tools removed and replaced.[10]

Third, once a coat of paint had been applied, it had to

---

5. Attachment A to contract for transmission structure painting between PPL Electric Utilities Corp. and QSC Painting, Aug. 30, 2007, ¶11 (Ex. P-83).
6. Specification for the maintenance painting of transmission structures §6.0 (Ex. P-83).
7. Specification for the maintenance painting of transmission structures §8.6 (Ex. P-83).
8. Specification for the maintenance painting of transmission structures §8.7 (Ex. P-83).
9. Specification for the maintenance painting of transmission structures §8.10 (Ex. P-83).
10. Specification for the maintenance painting of transmission structures §9.0 (Ex. P-83).

be allowed to "dry firm and hard before the succeeding coat is applied," and each successive coat had to be a lighter shade than the last.[11] Fourth, the paint materials had to be labeled with a full description and manufacturer information, and then stored in a separate structure.[12] Fifth, the PPL authorized representative was to walk around the work area with the workmen and dispose of any paint containers, rages, debris, or refuse.[13] Finally, the PPL authorized representative would measure the film thickness of the paint, ensure that it was uniform, and direct the workers to repaint or make spot repairs to any areas that were defaced or not uniform.[14] The contract required that "[t]he periphery of the existing coating surrounding spot repair areas shall be feathered-edged for a distance of approximately 1" to provide for a smooth coating transition."[15]

While the workmen painted, power might continue to surge through the lines attached to the poles.[16] As a result, the workers had to take "extra precautions when painting near insulators, making sure that paint does not splatter or drip onto insulators," and the workers would not be allowed to wipe paint off the insulators.[17] Also, PPL maintained control over the worksite: PPL supplied an "authorized representative," also known as a contract

---

11. Specification for the maintenance painting of transmission structures §8.8 (Ex. P-83).

12. Specification for the maintenance painting of transmission structures §13.0 (Ex. P-83).

13. Specification for the maintenance painting of transmission structures §14.0 (Ex. P-83).

14. Specification for the maintenance painting of transmission structures §15.0 (Ex. P-83).

15. Attachment A ¶17 (Ex. P-83).

16. Attachment A ¶4 (Ex. P-83).

17. Attachment A ¶2 (Ex. P-83).

field representative, for the project who was "the daily source of contact...in the areas of any question, materials, quality assurance, general safety, work procedures and schedule."[18] PPL had to go to the power substations and set the circuit breakers so that the workers would not be electrocuted.[19] PPL employed a "green tag" procedure where the PPL representative would not allow workers on the poles until the lines were set.[20]

Pursuant to PPL's internal guidelines for safety and health procedures, the PPL field representative had the duty to "monitor the contractor to ensure that safety requirements of the contract are adhered to. The PPL contract filed representative will, as warranted by the nature of the work being performed and the contractor's record of performance, observe the contractor's performance."[21] The PPL field representative had the authority to "stop the contractor's work for severe or repeated safety violations," and "if the PPL Field Representative observes an unsafe work practice involving a direct threat or imminent danger, the field Representative immediately will direct that all work stop[.]"[22]

PPL's poles dated from the 1980s.[23] The poles were custom ordered from defendant Thomas & Betts, with PPL establishing their specifications.[24] The pole specifications included the dimensions of the pole, its paint, and the

18. Attachment A ¶6 (Ex. P-83).
19. N.T. 02/29/12, pg. 14 line 2-pg. 15 line 5.
20. N.T. 02/29/12, pg. 15 line 25-pg. 16 line 5.
21. General Safety & Health Procedures Section 19, "Contractor Safety," revised January 2005, pg. 8, §7.2 (Ex. P-68).
22. *Id.*
23. N.T. 02/29/12, pg. 17, lines 6-8.
24. N.T. 02/29/12, pg. 21 line 5-pg. 22 line 15.

number and type of attachment points.[25] PPL was aware that the poles would need repainting every 15 to 20 years.[26] PPL did not specify that the poles should have any vangs[27] welded onto them so that a worker's lanyard or other suspension device could attach to the pole.[28] The only attachment points on the poles, beside those at the top of the poles and on the arms for electrical wires, were a series of brackets running up one side of the pole.[29] These brackets served as attachment points for removable single-rail ladders, known as "chicken" ladders.[30] They are known as "chicken" ladders because they are unstable and wobble, frightening workers.[31] There was no place for a worker climbing the pole to attach a lanyard or lifeline, except for somewhere on these ladders.[32] There were two types of ladders.[33] Both consisted of a central metal beam with metal pegs protruding out to the left and right. The first, termed a working ladder, had parallel pegs on each side to give the appearance of a straight bar across the rail so that a worker could stand level. The second type, the climbing ladder, had alternating pegs staggered at regular intervals up each side of the rail. The ladders came from the manufacturer with two bolts that attach through their bottom to secure them to the pole.[34] QSC, not having

---

25. N.T. 02/29/12, pg. 22 line 16-pg. 24 line 4.

26. N.T. 02/29/12, pg. 19, lines 6-14.

27. A vang is a welded-on piece of metal to which a worker can attach a lanyard or other fall protection. N.T. 03/29/12, pg. 29 line 25 — pg. 30 line 3.

28. N.T. 02/29/12, pg. 29 line 24-pg. 30 line 19.

29. N.T. 02/29/12, pg. 26 line 10-pg. 27 line 21.

30. N.T. 02/29/12, pg. 26 line 18-pg. 27 line 7.

31. N.T. 03/07/12, pg. 169 line 2-pg. 170 line 17.

32. N.T. 02/29/12, pg. 29, lines 13-18.

33. N.T. 02/29/12, pg. 36 line 3-pg. 37 line 9. *See also* Ex. P-52.

34. N.T. 02/29/12, pg. 37 line 24-pg. 38 line 6; N.T. 03/02/12, pg. 40, lines 8-12.

another means of lifting its workers into place to paint the pole, asked PPL for the removable ladders.[35] PPL provided QSC with the ladders, but not with the bolts.

On September 23, 2007, plaintiff Vincent Nertavich was 40 feet off the ground working on a PPL pole. More experienced workers were painting the pole above him. He was standing on one of the climbing ladders. QSC provided plaintiff with a pole belt, a body harness, and two lanyards.[36] One lanyard was to attach to the pole belt, and the other was to attach to the body harness to serve as a lifeline.[37] Plaintiff used only the pole belt and one lanyard.[38] He testified at trial that on previous jobs he had used only the pole belt and one lanyard, and that no one told him he had to use the harness as well.[39] The one lanyard he used was coated in dried paint.[40] Plaintiff tied the paint-coated lanyard to the ladder above him, a working ladder, by looping it around a left peg.[41] Plaintiff, holding on to the lanyard, leaned out to his left to slap paint on a hard-to-reach spot on the back of the pole.[42] The ladder above him to which he was tied off wobbled several inches to the left. The lanyard unlooped. Plaintiff fell 40 feet, landing on his feet.[43] The fall fractured his feet, dislocated his ankles, fractured his knee, his right femur, his right hip, and burst several of his lumbar spine disks.[44] Plaintiff lost 3 inches in height as his body literally compacted from the fall.

35. N.T. 02/29/12, pg. 33, lines 7-20.
36. N.T. 03/07/12, pg. 160, line 4.
37. N.T. 02/29/12, pg. 159, lines 12-20.
38. N.T. 03/01/12, pg. 24, lines 2-5.
39. N.T. 03/01/12, pg. 33, lines 3-22.
40. N.T. 03/01/12, pg. 73 line 24-pg. 75 line 8.
41. N.T. 03/01/12, pg. 57 line 22-pg. 61 line 20.
42. N.T. 03/01/12, pg. 65 line 24-pg. 71 line 11.
43. N.T. 03/01/12, pg. 75 line 6-pg. 76 line 9.
44. N.T. 03/01/12, pg. 80 line 16-pg. 84 line 25.

PPL's field representative for the QSC job was Wayne Grim. At trial, Grim testified that the QSC job was his first as a PPL field representative for a pole painting operation.[45] He admitted that he was familiar with PPL's guidelines for safety and health procedures.[46] He knew that it was his duty to monitor the work and ensure it was performed in a safe manner.[47] He understood that if something unsafe occurred, he had a duty to stop the work until the unsafe condition was corrected.[48] He conceded that part of his job was to monitor that the workers wore appropriate fall protection, and to stop work if they did not.[49] However, Grim had no experience in climbing a transmission pole, and no training on PPL's own internal requirements of fall protection, which included a requirement that a locking hook be used to attach a lanyard to an anchor point.[50]

Grim was at the worksite every day.[51] He observed the QSC workers while they were on the poles.[52] On multiple occasions Grim observed plaintiff working on the poles.[53] He observed the fall protection plaintiff used, how plaintiff was tied on to the pole, and how plaintiff used only one lanyard to secure himself.[54] Grim did not think anything was improper.[55] He testified that he did not think there was

---

45. N.T. 02/29/12, pg. 154, lines 7-13.
46. N.T. 02/29/12, pg. 154 line 23-pg. 155 line 3.
47. N.T. 02/29/12, pg. 158, lines 9-14.
48. N.T. 02/29/12, pg. 158, lines 15-25.
49. N.T. 02/29/12, pg. 159, line 25-pg. 160 line 9.
50. N.T. 02/29/12, pg. 154 line 14-pg. 156 line 5.
51. N.T. 02/29/12, pg. 157, lines 12-13.
52. N.T. 02/29/12, pg. 159, lines 2-7.
53. N.T. 02/29/12, pg. 167, lines 16-22. He observed plaintiff with great enough detail to remember an occasion on which he saw plaintiff smoking a cigarette while on the pole. N.T. 02/29/12, pg. 184 line 21 — pg. 185 line 9.
54. N.T. 02/29/12, pg. 167 line 23-pg. 168 line 4.
55. N.T. 02/29/12, pg. 168, lines 5-14.

anything wrong with a worker using only one lanyard, and that he would not stop work because of it. He did not think anything was wrong with a worker only wrapping their lanyard around one of the pegs of the ladders, and would not stop work because of it.[56] Grim had never discussed use of safety equipment with the workers before work began.[57] Over the course of days of observation, Grim never told plaintiff that he was doing anything improper.[58]

Another PPL employee, Gallus Wukitsch, also testified at trial. He was a senior engineer in 2007, and PPL's contract administrator for the QSC job.[59] Wukitsch was asked about PPL's control over the job through contractual provisions. He was questioned about the contract provision that required the workers to take extra precaution when painting around a insulator, and prohibiting them from wiping paint off the insulators:

Q: That was, in other words, telling QSC how, in one manner, how they were going to be doing their work around the insulators on the poles; is that right?

A: Yes.[60]

He was asked about the contract provision requiring workers to lay out tarps before work began to catch debris:

Q: [T]hat's how you're telling them in the contract how they're supposed to do this part of the work[?]

---

56. N.T. 02/29/12, pg. 169 line 2-pg. 170 line 19.
57. N.T. 02/29/12, pg. 172 line 23-pg. 173 line 8.
58. N.T. 02/29/12, pg. 168, lines 5-14.
59. N.T. 02/29/12, pg. 79, lines 13-15.
60. N.T. 02/29/12, pg. 52, lines 7-11.

A: Yes.[61]

He was also asked about the contract provision mandating how spot repairs had to be feathered-edged:

Q: So this was basically telling QSC, in one respect, how they were to do the actual touch-up work, spot painting work; is that right?

A: Yes.[62]

Mr. Wukitsch also testified about PPL's role in ensuring job site safety. He admitted that under the terms of the contract and PPL's internal operating documents, PPL retained a duty to monitor the work during the existence of the contract.[63] He testified that Mr. Grim, as PPL's field representative, had the duty to observe the workers, and ensure that they were wearing full body harnesses and were properly tying off to the pole.[64] Further, Mr. Grim had the duty to ensure safety meetings were held every day at the worksite.[65] Mr. Grim had the ability and duty to shut down the work if he saw that it was not being done safely.[66] Failure of a worker to wear a safety harness while climbing was a severe safety violation.[67] Mr. Grim was responsible for halting operations if he saw a worker without a harness.[68] Mr. Wukitsch was the PPL manager who put in a request for a field representative for the QSC job, and set out the specifications. In his specifications

61. N.T. 02/29/12, pg. 54 line 23-pg. 55 line 2.
62. N.T. 02/29/12, pg. 56, lines 9-12.
63. N.T. 02/29/12, pg. 70, lines 18-22.
64. N.T. 02/29/12, pg. 78, lines 4-24.
65. N.T. 02/29/12, pg. 79, lines 10-19.
66. N.T. 02/29/12, pg. 73 line 22-pg. 74 line 7.
67. N.T. 02/29/12, pg. 81, line 8-12.
68. N.T. 02/29/12, pg. 82, lines 5-12.

he did not request someone trained in pole climbing, or who knew anything about tying off.[69] Nonetheless, even though Mr. Grim had no specific training, Mr. Wukitsch believed that Mr. Grim was qualified to fulfill his duties.[70]

At trial plaintiff called Stephen Estrin as an expert on occupational safety and health.[71] Estrin testified that PPL had a duty under the Occupational Safety and Health Act (OSHA) to monitor QSC worker safety at the worksite.[72] Estrin opined that PPL breached that duty in various respects. First, the standard industry practice under OSHA prohibits the use of single-rail ladders.[73] PPL should have gone to the worksite and stopped any work being done on the single-rail ladders.[74] At the very least, PPL should have provided QSC with the bolts to secure the ladders to the pole.[75] Second, it was inappropriate under OSHA and PPL's internal safety and health guidelines for workers to attach their lanyards to the ladders.[76] PPL should have ensured that there was a proper way for the workers to be able to tie off and proper anchorage points on the pole.[77] Third, PPL had a duty under OSHA and good construction site practice to ensure that the workers were using proper fall protection.[78] The duty obliged the PPL representative to examine plaintiff's equipment before plaintiff climbed the pole.[79] Fourth, OSHA and industry practice required

---

69. N.T. 02/29/12, pg. 83 line 13-pg. 84 line 9.
70. N.T. 02/29/12, pg. 85 line 24-pg. 86 line 16.
71. N.T. 03/06/12, pg. 48 line 20-pg. 55 line 23.
72. N.T. 03/06/12, pg. 119, lines 19-20.
73. N.T. 03/06/12, pg. 70, lines 10-13.
74. N.T. 03/06/12, pg. 120, lines 21-23.
75. N.T. 03/06/12, pg. 97, lines 10-16.
76. N.T. 03/06/12, pg. 116, lines 16-18.
77. N.T. 03/06/12, pg. 120 line 24-pg. 121 line 2.
78. N.T. 03/06/12, pg. 143, lines 22-25.
79. N.T. 03/06/12, pg. 143, lines 2-8.

PPL to provide a competent person on the job site to evaluate worker safety.[80] In Estrin's opinion, Mr. Grim was not a competent person for the job.[81] Mr. Grim had no experience and inadequate training in fall protection procedure; he did not even know what safety concerns to look for.[82]

Plaintiff also presented an electrical consulting engineer, Gregory Booth, as an expert in engineering design and project management.[83] Booth testified that PPL had a duty under industry practices, the National Electrical Safety Code (NESC), and PPL's own internal safety operating guidelines, to monitor worker safety.[84] An electric utility company, which has thousands or even hundreds of thousands of utility poles which its employees climb every day, necessarily knows the best and most appropriate way to protect workers climbing the poles.[85] Because PPL kept the power lines energized, PPL did not allow QSC to use aerial lifts or other poles that would come in proximity to the power lines, leaving QSC with only the option to use the single-rail ladders. PPL should have held a pre-work conference with the QSC workers to tell them about NESC standards for fall protection, and the specific dangers of working on the ladders.[86] Instead, PPL field representative Mr. Grim, held what Booth considered an incomplete pre-work conference, where Mr. Grim only discussed the green-tag procedure with the workers but

80. N.T. 03/06/12, pg. 122, lines 19-22.
81. N.T. 03/06/12, pg. 123, lines 5-11.
82. N.T. 03/06/12, pg. 123, lines 14-22.
83. N.T. 03/01/12, pg. 200, lines 11-18.
84. N.T. 03/01/12, pg. 249 line 20-pg. 250 line 10.
85. N.T. 03/01/12, pg. 261, lines 3-14.
86. N.T. 03/02/12, pg. 18 line 13-pg. 19 line 18.

made no mention of fall protection.[87]

According to Booth, Mr. Grim as PPL field representative had overlapping safety obligations with QSC's supervisor at the worksite, including the obligation to stop work whenever he observed a worker endangering their life or the life of others.[88] Under industry practice, the NESC, or PPL's internal safety guidelines, a worker tying off by wrapping his lanyard on the peg of a ladder constitutes a serious safety violation that the field representative should recognize warrants the stop of work.[89] Mr. Grim, not having been properly trained in climbing poles and having no experience, was not qualified to serve as PPL's contract field representative. In Booth's opinion, PPL breached its standard of care merely by having Mr. Grim serve as contract field representative on the job.[90]

PPL claims multiple errors it believes entitle it alternately to judgment notwithstanding the verdict or a new trial. Judgment notwithstanding the verdict, or JNOV, is the court directing verdict in favor of the losing party despite a verdict to the contrary.[91] JNOV is an extreme remedy which is properly entered by the trial court only where, viewing the evidence in the light most favorable to the verdict winner, the facts are so clear that no two reasonable minds could disagree that the verdict was improper,[92] or the movant is entitled to judgment as a

87. N.T. 03/02/12, pg. 21 line 20-pg. 22 line 14.
88. N.T. 03/01/12, pg. 255 line 19-pg. 256 line 9.
89. N.T. 03/01/12, pg. 232, lines 17-22.
90. N.T. 03/02/12, pg. 29, lines 5-16.
91. *Green Valley Dry Cleaners. Inc. v. Westmoreland Cnty. Indus. Dev. Corp.*, 861 A.2d 1013, 1016 (Pa. Commw. Ct. 2004).
92. *Rohm & Haas Co. v. Cont'l Cas. Co.*, 732 A.2d 1236, 1248 (Pa. Super. Ct. 1999) *aff'd*, 566 Pa. 464, 781 A.2d 1172(2001).

matter of law.[93]

Grant of a new trial is an extraordinary remedy.[94] The decision of whether to grant a new trial rests in the discretion of the trial judge.[95] The trial court follows a two-step process: the trial court must decide whether one or more mistakes occurred at trial, and then it must determine whether any mistake was a sufficient basis for granting a new trial.[96] A new trial should only be granted when "the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail,"[97] or the moving party demonstrates to the trial court that he or she has suffered prejudice from a legal mistake.[98] A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently.[99]

Many of the claimed errors overlap.

A. PPL's Negligence was Properly Submitted to and Determined by the Jury under the Retained Control Exception to Landowner Liability.

PPL argues that it cannot be held liable for plaintiff's injuries. Particularly PPL relies on Pennsylvania Supreme Court's decision in *Beil v. Telesis Construction. Inc.*[100] to

---

93. *Moure v. Raeuchle*, 604 A.2d 1003, 1007 (Pa. 1992).
94. *Criswell v. King.* 834 A.2d 505, 512 (Pa. 2003).
95. *Armbruster v. Horowitz*, 813 A.2d 698, 702 (Pa. 2002).
96. *Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1122 (Pa. 2000).
97. *Renna v. Schadt*, 64 A.3d 658, 670 (Pa. Super. Ct. 2013) (internal citations omitted).
98. *Harman*, 756 A.2d at 1122.
99. *Id.*
100. 11 A.3d 456 (Pa. 2011).

categorically argue that as the hirer of an independent contractor to perform work on its property, PPL owed plaintiff no duty.

Generally, a landowner who employs an independent contractor owes only the duty of reasonable care to have the property in a safe condition for work, and to warn of known defects, but is not otherwise vicariously liable for injuries to the independent contractor's employees.[101]

Section 414 of the Restatement (Second) of Torts provides the retained control exception to the no-duty rule:

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.[102]

The comments to §414 further outline the exception. Comment (a) explains "[i]f the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein[.]"[103] This is so even if the owner retains only limited control over the work:

The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being

---

101. *Celender v. Allegheney County Sanitary Auth.*, 222 A.2d 461, 463 (Pa. Super. Ct. 1966).

102. Restatement (Second) of Torts §414 (1965).

103. Restatement (Second) of Torts §414 com. (a).

done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others.[104]

Comment (c), however, explains that the owner must exercise at least some modicum of control over the way and means that the contractor performs:

In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods, of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.[105]

The Pennsylvania Supreme Court applied the retained control exception to determine a landowner was liable for a contractor's injuries in *Byrd v. Merwin.*[106] The contractor testified at trial that the owner controlled when and where

---

104. *Id.*
105. Restatement (Second) of Torts §414 com. (c).
106. 317 A.2d 280 (Pa. 1974).

work began and the order in which the work was to be completed, and that the contractor was not in complete control of the project.[107] Rather, the owner exercised some command. The court found that those facts aligned with the descriptions of control described in comment (a) to §414, in particular the owner's control over the order in which work was performed.

In two subsequent cases, the Supreme Court determined that the retained control exception did not apply. In *Farabaugh v. Pennsylvania Turnpike Commission*, the landowner showed a safety videotape to the contractor's workers before work began, and hired a construction manager to supervise safety issues for the project and conduct safety inspections.[108] But the landowner completely turned over control of the worksite to the contractor in all other respects, and there was no evidence that the landowner exerted any control over how the work was to be performed. The court noted that it would be against public policy to impose liability on the landowner merely for hiring a manager to supervise safety and showing a safety video to the contractor's workers because it would discourage safety measures, and held that the plaintiff had not presented sufficient evidence to prove that the landowner "retain[ed] control over [the contractor's] means and methods for purposes of a Section 414 analysis."[109] However, the Court held that the manager

---

107. *Id.* at 282.

108. *Farabaugh v. Pennsylvania Turnpike Com'n*, 911 A.2d 1264, 1271 (Pa. 2006).

109. *Id.* at 1275. *See also LaChance v. Michael Baker Corp.*, 869 A.2d 1054 (Pa. Commw. Ct. 2005) (holding that retained control exception did not apply where landowner contractually retained and exercised right to safety inspections, but did not exercise any other control over the manner or operational details of the project, because contract language

could potentially be liable to the plaintiff because it took an active role in ensuring worksite safety.[110]

The Supreme Court most recently addressed the retained control exception in *Beil*.[111] There the landowner was a college that hired a contractor to renovate its engineering building, including roofing, siding, and masonry work. The contractor, in turn, hired subcontractors to perform the work. The plaintiff was a worker injured when he fell from scaffolding while carrying materials to the roof without wearing any fall protection. In its agreement with the contractor, the landowner retained the ability to set limitations on use of the property, and made the contractor agree to comply with any safety direction or rules reasonably issued by the landowner to prevent injuries.[112] The landowner also had a project manager who controlled worker access to the engineering building because part of it was being used by students. The landowner did not allow smoking in the building, and did not allow the workers to take breaks in front of the building after a worker made offensive comments to a female student.[113] However, there was no evidence that the landowner exercised any control, contractually or in fact, over how the workers performed the masonry and roofing work.

The court stated that the control required to meet §414's retained control exception can be demonstrated through contractual provisions that give the landowner control over the manner, method, and operative details

was standard and it was against public policy to impose liability on landowner for addressing safety in the contract).

110. *Id.* at 1282.

111. 11 A.3d 456 (Pa. 2011).

112. *Id.* at 462.

113. *Id.* at 465.

of the work, or can be demonstrated by actual control over the work.[114] However, "the question of the quantum of retained control necessary to make the owner of the premises liable is a question for the jury."[115] The evidence of control in this case fell into two broad categories: safety and access. Regarding safety, the court held that a landowner who retains some control over safety, like the landowner college, has not exercised sufficient control.[116] However, the court did not "rule out the possibility that, in certain circumstances not present in this matter, a property owner's actions concerning safety matters could constitute sufficient control over the manner in which work is done such that the owner is subject to liability."[117] Turning to access, the court examined both comment (a) and (c) to §414 to determine that for access to be evidence of control, it had to impact the operational detail or manner in which work was completed. The landowner college's regulation of access to the engineering building was tangential to the work of the contractors and was not qualitatively sufficient.[118]

Here, PPL through its contract and specifications told QSC workers what paint to use, and every step of how to use it. It told the workers to lay out tarps beneath the poles, to mix and stir the paint, to clean and dry the poles, to paint the poles with rollers, brushes, and mitts, to let the paint dry hard and firm, then to apply successive coats, to

---

114. *Id.* at 467.

115. *Id. See also Hargrove v. Frommeyer & Co.*, 323 A.2d 300, 304 (Pa. Super. Ct. 1974)(holding that evidence of landowner supervising design and construction of building sufficient ot submit issue of control to the jury).

116. *Id.* at 469.

117. *Id.* at 469 n. 4.

118. *Id.* at 471.

clean up the work area by disposing of paint containers and debris, and finally to make spot repairs-in a specific feather-edged manner-when directed to do so by PPL. PPL's own contract manager testified at trial that these provisions told QSC workers how to perform the operative details of their job.

The contract also called for safety provisions to be followed, and established the position of the PPL contract field representative. PPL's contract field representative, Mr. Grim, was at the worksite every day, and knew that it was his duty to stop work if he saw an unsafe condition, even if he was not knowledgeable enough to know when such a condition existed. Mr. Grim was supposed to hold safety meetings every day for the workers, even though he did not. He had the duty to inspect worker fall protection.

Also, PPL exerted great control over access to the property. Through its green tag procedure, PPL retained control of the property, and significantly limited worker access to the poles because of the live electric wires. Workers could not get on the poles until Mr. Grim let them. Also, the available ways to scale the poles were essentially limited to the single-rail ladders because the poles were energized, and there were no other attachment points on the poles to rig other climbing devices. QSC had to request these ladders from PPL to climb the poles.

These facts, especially the way in which PPL dictated how QSC workers were to perform their painting work coupled with evidence of control over safety and access, evince the quality of control that the Supreme Court found lacking in *Beil*.[119] The qualitative element being present,

---

119. Plaintiff's claim survived a motion for summary judgment, a

it was for the jury to determine if the quantity of control necessary to make PPL liable existed. There were ample facts in evidence, including the contract and testimony from PPL's own employees, for the jury to determine that the necessary quantum of control existed as they did.

B. The Jury Charge, Based on the Standard Instructions, Accurately Provided the Jury with the Law Necessary to Determine the Factual Issues Presented.

Defendant PPL claims multiple errors in the jury charge related to negligence on the basis that it inaccurately conveyed the principles of *Beil*.[120] The court charged the jury as follows:

> This is a negligence case. And the first question is: was PPL Electric Utilities Corporation negligent? And it has a place for you to check yes or no. The legal term negligence, otherwise known as carelessness, is the absence of ordinary care that a reasonably prudent person would use under the circumstances presented. Negligent conduct may consist of an act or or a failure to act when there is a duty to do something....Now, you've heard two weeks, I guess, of testimony about PPL and [QSC]. And that's what we call an independent contractor. PPL hired [QSC], an independent contractor. The employer of an independent contractor—and all that means is PPL—is not usually responsible for any negligent conduct of the contractor or its employees. The exception is where the employer, PPL, retains control over any part of the work. Also, you should

motion for compulsory nonsuit, and a motion for directed verdict, all of which were based on the argument that the claim could not survive under the *Beil* analysis.

120. Defendant alleges the same defects in the jury verdict sheet.

know that a person or a corporation, PPL, who undertakes to provide services necessary for the safety of somebody else, assumes a duty to use reasonable care in performing those services.[121]

While acknowledging that it constitutes the standard jury instruction, defendant PPL argues that the portion of the charge explaining the retained control exception, and the sentence of the charge that explains that an individual who provides services necessary for the safety of another assumes a duty to perform those services non-negligently are erroneous. Instead, defendant PPL contends that the court should have given its proposed jury charges, consisting of five verbose and repetitive pages containing multiple citations to and quotes taken from *Beil*.[122]

A court's primary duty when charging a jury is to clarify the issues so that the jury may understand the questions to be resolved.[123] The court is free to formulate and express the charge in any way the court sees fit so long as it fairly and accurately relates the law to the jury.[124] The court may be guided by standard jury instructions, but is not required to use any prescribed language.[125] The jury charge is taken as a whole, against the backdrop of all the evidence.[126] The court may refuse to give a requested point for charge if the point has already been adequately and sufficiently covered by another general or specific instruction.[127] Also,

121. N.T. 03/08/12, pg. 296 line 21-pg. 298 line 23.
122. These were defendants proposed charges 19 through 23.
123. *Com. v. Beach*, 264 A.2d 712, 714 (Pa. 1970).
124. *Butler v. Kiwi, S.A.*, 604 A.2d 270, 273 (Pa. Super. Ct. 1992).
125. *Hawthorne v. Dravo Corp., Keystone Div.*, 508 A.2d 298, 303 (Pa. Super. Ct. 1986).
126. *Buckley v. Exodus Transit & Stroage Corp.*, 744 A.2d 298, 305 (Pa. Super. Ct. 1999).
127. *Id.* at 306.

the court need not give a point for charge that requires modification, qualification, or refinement because it is not the duty of the court to restate points that are inadequate as stated.[128] Because the purpose of the jury charge is to clarify issues for the jury, it is axiomatic that a court does not need to give a confusing proposed point for charge.[129]

Here, the court gave the jury, almost verbatim, the suggested standard civil jury charge related to the retained control exception.[130] The court instructed the jury that the retained control exception applied if PPL "retained control over any part of the work." Section 414 of the Restatement (Second) of Torts provides that the exception applies if the landowner "retains the control of any part of the work." Comment (a) to §414 explains the exception applies if the landowner "retains control over the operative detail of doing any part of the work." The Supreme Court in *Beil* relied on both §414 and comment (a) as accurate statements of the law. The Supreme Court's statement in *Beil* that the exception applies when the "owner retains control over the manner in which the work is done"[131] is substantially the same as saying that the owner must control any part of the work. This court used language calculated to accurately and concisely convey to the jury the main concept behind §414. The five pages worth of instructions that defendant PPL argues should have been given would have only served to confuse the issues.

---

128. *Id.*

129. *See Quinby v. Plumsteadville Family Practice, Inc.*, 907 A.2d 1061, 1069-70 (Pa. 2006) ("A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to a fundamental error.").

130. *See* SSJI 6.140 (2003).

131. *Beil*, 11 A.3d at 466.

Likewise, defendant mistakenly argues that the court erred by giving the portion of the charge explaining that one that provides a service for another's safety must do so with reasonable care.[132] It has long been Pennsylvania law that one who assumes a duty, for whatever reason, and negligently performs that duty so that another is harmed is liable for the harm.[133] Even if a defendant does not initially owe the plaintiff any legal duty to perform an act, the defendant will be liable if he acts negligently.[134] Evidence was presented at trial that PPL had assumed responsibility for QSC worker safety contractually and actually. It was for the jury to determine if PPL breached its duty.

Thus, the court's jury charge was sufficient and proper.

C. The Court Properly Admitted Evidence of Defendant PPL's Negligence, Including Industry Standards and the Specifications PPL Dictated for its Poles.

Defendant PPL asserts a bevy of alleged errors related to evidence of its negligence. PPL argues that the court impermissibly allowed evidence of PPL's OSHA and NESC violations, that QSC did not properly train and institute safety precautions for its workers, Mr. Grim's lack of knowledge and experience regarding safety issues, the design specifications of the pole and the ladders, and alternative methods of climbing the poles. PPL contends this evidence was irrelevant because PPL did not owe

---

132. For this proposition, at oral argument defendant relied upon dicta in *Fulmer v. Duquesne Light Co.*, 543 A.2d 1100, 1105 (Pa. Super. Ct. 1988), that a landowner need not take every precaution to prevent injury to a contractor's employees. However, that case says nothing that negates a landowner's duty to act with reasonable care if the landowner does in fact endeavor to take a precaution to prevent worker injuries.

133. *Feld v. Merriam*, 485 A.2d 742, 746 (Pa. 1984).

134. *Pascarella v. Kelley*, 105 A.2d 70, 73 (Pa. 1954).

plaintiff any duty.

A claim of negligence consists of a duty, a breach of that duty, causation, and damages.[135] A plaintiff may proceed against a defendant on a theory of of direct liability, vicarious liability, or both.[136] A defendant landowner may be vicariously liable for the negligent acts or omissions of a contractor under the retained control exception, and may also be directly liable for his own negligent acts.[137] A defendant may have a preexisting legal duty, or may assume a duty to act with reasonable care by providing services to protect people or their property.[138] A defendant can take on duties to supervise safety oversight by contract or practice and be held liable for negligent performance.[139] Generally, industry standards and regulations are relevant and admissible on the issue of negligence.[140]

Here, plaintiff presented evidence that defendant PPL was directly negligent. PPL's internal operating procedures required that its contract field supervisor to monitor worksite safety. PPL's field contract supervisor Mr. Grim knew that he had duties to monitor the worksite. He knew he had to stop work if he saw an unsafe condition. He knew that he was supposed to ensure that the workers wore proper fall protection. PPL's contract administrator Mr. Wukitsch confirmed Mr. Grim's duties to monitor

---

135. *Grossman v. Barke*, 868 A.2d 561, 566 (Pa. Super. Ct. 2005).

136. *Scampone v. Highland Park Care Ctr., LLC*, 57 A.3d 582, 597 (Pa. 2012).

137. *Chenot v. A.P. Green Servs., Inc.*, 895 A.2d 55, 63 n.6 (Pa. Super. Ct. 2006).

138. *Feld*, 485 A.2d at 746.

139. *See Health v. Huth Enigineers, Inc.*, 420 A.2d 758, 759 (Pa. Super. Ct. 1980).

140. *Birt v. Firstenergy Corp.*, 891 A.2d 1281, 1290 (Pa. Super. Ct. 2006).

safety, and added that Mr. Grim was supposed to make sure there were daily safety meetings.

PPL set out specifications for its poles that ensured limited access and tie-off points for anyone attempting to scale the pole, even while knowing that the pole would have to be re-painted. The only way to climb the pole was by the single-rail ladders, and the only place for a worker to tie-off is on the ladder itself. Having created this condition, PPL then did not give QSC the bolts to secure the ladders to the pole. Had these bolts been used, the ladders would not have shifted several inches to each side as the worker moved. PPL field representative Mr. Grim should have been aware of the dangers posed by the job to the QSC workers, and admittedly had a duty to ensure the workers knew of the dangers and were prepared to face them. However, neither before awarding the contract nor after work commenced did PPL discern QSC workers' knowledge, training, or preparedness on how to climb and tie-off on its pole.

Plaintiff's experts testified that under industry practice, which included OSHA and the NESC, defendant PPL breached its duties. PPL should not have allowed QSC workers to tie off to the single-rail ladders, and at the very least should have given QSC the bolt to secure the ladders. PPL had a duty to provide a competent field representative. But, they provided Mr. Grim, who knew so little about climbing a transmission pole that he did not even know plaintiff was tied-off incorrectly. Mr. Grim did not inspect QSC worker equipment, or ensure safety meetings were held.

This evidence of PPL's direct negligence was admissible

to prove PPL breached a duty owed to plaintiff.

D. The Court Properly Found that Assumption of the Risk did not Apply Where There was no Evidence that the Plaintiff Appreciated a Risk and Incurred it Anyway.

Defendant PPL contends that the court should have granted it judgment on the basis that plaintiff assumed the risk of his fall, or alternatively put the issue to the jury.

Assumption of the risk is an affirmative defense that arises when a plaintiff apprehends a danger, and then consciously decides to tempt fate and face the danger.[141] It is a judicially created doctrine developed during the industrial revolution to relieve employers from bearing the full cost that necessarily will accrue when workers must perform dangerous jobs.[142] Assumption of the risk is essentially a form of estoppel in the context of tort, barring the plaintiff from recovery.[143] Over time, the policies underlying the doctrine have eroded, and assumption of the risk has all but been abolished and replaced with comparative negligence except in specialized circumstances.[144] Those circumstances are very narrow.[145] A defendant must establish beyond question the two components to the doctrine: the plaintiff must have perceived the risk, and then the plaintiff must have voluntarily faced the risk.[146] To be voluntary, the circumstances must show that the plaintiff manifested a willingness to accept the risk,

141. *Bullman v. Giuntoli*, 761 A.2d 566, 570 (Pa. Super. Ct. 2000).
142. *Staub v. Toy Factory. Inc.*, 749 A.2d 522, 527-28 (Pa. Super. Ct. 2000).
143. *Bullman*, 761 A.2d at 570.
144. *Staub*, 749 A.2d at 528.
145. *Bullman*, 761 A.2d at 571.
146. *Barrett v. Fredavid Builders, Inc.*, 685 A.2d 129, 131 (Pa. Super. Ct. 1996).

over and above mere contributory negligence, so that the plaintiff has gone so far as to abandon his right to complain.[147]

Assumption of the risk is a question for the court to decide and not a matter for the jury.[148] The court can only decide that the plaintiff has assumed the risk where it is beyond question that the plaintiff voluntarily and knowingly faced an obvious danger.[149] The court must decide that reasonable minds could not differ as to whether the plaintiff assumed the risk.[150] If the court does not as a matter of law decide that the plaintiff assumed the risk, then the jury is only to be given a comparative negligence charge.[151]

The doctrine has been severely limited except for the most egregious situations where the plaintiff has clearly taken on the risk. The seminal example of assumption

147. *Staub*, 749 A.2d at 529.

148. *Struble v. Valley Forge Military Academy*, 665 A.2d 4, 8 (Pa. Super. Ct. 1995). Defendant cites to *Long v. Norriton Hydraulics*, 662 A.2d 1089 (Pa. Super. Ct. 1995), to argue that Pennsylvania law is unsettled regarding whether assumption of the risk is an issue for the judge or the jury. The *Long* opinion does not hold, as Defendant implies, that assumption of the risk is a jury matter. The Superior Court in *Long* found that the trial court improperly granted summary judgment on the basis of assumption of the risk because it was not beyond question that plaintiff knowingly and voluntarily faced an obvious danger, and that the case should proceed to trial. 662 A.2d at 1091. The Superior Court did not, however, state that the issue of assumption of the risk should go to the jury. In *Struble*, an opinion issued approximately four months after *Long* and authored by the same judge, the Superior Court explicitly stated "that the question of whether a litigant has assumed the risk is a question of law and not a matter for jury determination," and further made clear that "once the trial court decides that assumption of the risk is not the basis for a compulsory nonsuit, the jury is to be charged only on comparative negligence." *Struble*, 665 A.2d at 8.

149. *Long v. Norriton Hydraulics*, 662 A.2d 1089, 1091 (Pa. Super. Ct. 1995).

150. *Staub*, 749 A.2d at 529-30.

151. *Struble*, 665 A.2d at 8.

of the risk is *Carrender v. Fitterer*, where our Supreme Court determined that a woman who knowingly chose to park her car in an icy area of a parking lot, even though there were other areas free of ice and snow, assumed the risk when she slipped and fell on the ice, and was barred from recovery.[152] However, a plaintiff will not be considered to have assumed the risk merely because he has a dangerous job. In *Staub v. Toy Factory. Inc.*,[153] a worker was injured while installing roof insulation when he stepped in a hole that he knew existed but did not know its exact location. The Superior Court held assumption of the risk was inapplicable. Specifically, the Superior Court held that in the context of workplace negligence with a dangerous job, the worker's "conduct is better judged by its reasonableness, that is, by negligence principles. A trial court should not, therefore, decide the issue as one of duty or lack thereof; instead, the issue should go to the jury as one of comparative negligence."[154]

Here, plaintiff testified that he performed his job in the same way that he always had previously, and that he did not know that he was tied off improperly. He testified that he did not know the danger that he was in. He did not know that he needed to wear a harness. His job, which included reaching out and slapping paint on to the back of a pole, was dangerous. But there was no evidence presented that plaintiff subjectively expected that his lanyard would slip, and yet faced the risk anyway. Defendant did not prove that, as a matter of law, plaintiff assumed the risk. The case properly went to the jury for determination based

---

152. 469 A.2d 120, 125 (Pa. 1983).
153. *Staub v. Toy Fatcory. Inc.*, 749 A.2d 522 (Pa. Super. Ct. 2000).
154. *Id.* at 530 (internal quotes and citation omitted).

on comparative negligence principles. Thus, the court properly denied defendant's request that the jury be given an assumption of the risk charge.

For the reasons set forth above, post-verdict motions were denied.